UNITED STATES of America

v.

Daryl Bernard McFARLEY.

No. C–CR–91–140–P.

United States District Court,
W.D. North Carolina,
Charlotte Division.

March 25, 1992.

H. Thomas Church, Charlotte, N.C., for plaintiff.

M. Pete Dominguez, Charlotte, N.C., for defendant.

## ORDER

ROBERT D. POTTER, District Judge.

THIS MATTER is before the Court on the Memorandum and Recommendation ("M & R") entered by Magistrate Judge Paul B. Taylor [hereinafter referred to as "Magistrate"] on January 21, 1992.

Magistrate Taylor entered the above-noted Memorandum and Recommendation in response to Defendant's motion to suppress after holding an evidentiary hearing on December 19, 1991. The United States of America (hereinafter the "Government") filed a general objection to the Magistrate's M & R on February 14, 1992. The Government filed more specific objections and a brief in support on March 5, 1992.

The Court must conduct a *de novo* review of the matters to which the Government has objected. 28 U.S.C. § 636(b)(1). In conducting its *de novo* review of this matter, the Court has considered carefully the record, including Defendant's motion to suppress, filed December 3, 1991, and the Government's objections to the M & R, the

M & R itself and the transcript of the evidentiary hearing held before Magistrate Taylor on December 19, 1991 ("Tr."). The Court also has reviewed the pertinent legal authorities. After conducting this *de novo* review, this Court believes that the Magistrate has not applied the law correctly in this matter.

## FINDINGS OF FACT

1. This matter involves a stop made pursuant to the routine surveillance that the Charlotte Narcotics Interdiction Task Force conducts at the Charlotte bus terminal. On August 1, 1991, Officers Faulkenberry, Holbrook, Witherspoon and Sennett were conducting surveillance at the Charlotte bus terminal which is located at 601 West Trade Street. (Tr. at 4). At approximately 9:45 that morning, the officers observed Greyhound bus No. 5255 from New York City pull into the terminal. (*Id.*) Officer Faulkenberry observed Defendant and another person, Mr. Stitt, exit the bus. (*Id.* 6–8).

2. At that time, Officer Faulkenberry had been working with the Charlotte Police Vice Department for approximately a month and with the Street Drug Interdiction Squad for two months. (Tr. 3–4).

3. The officers had been trained that drugs are more likely to come from what are termed "source cities." New York, together with Miami, Houston, Newark, New Jersey, and cities in south Florida are among the cities designated as "source cities." (Tr. 10).

4. Officer Faulkenberry observed the Defendant exit Greyhound bus No. 5255 after it arrived at the bus terminal on that morning.

5. The Defendant was the first passenger off the bus. His dress was crisp, fresh, and he appeared well-groomed, not withered as the other passengers appeared (Tr. at 7).

6. The officers were casually dressed in blue jeans, tennis shoes and shirts. They were carrying weapons which were concealed and never visible on that day. (*Id.* at 7).

7. After Defendant got off the bus, a second person who was later identified as Mr. Stitt came to the door behind him. Mr. Stitt's dress was also fresh, crisp and clean. (Tr. 8, 10).

8. When the Defendant exited the bus he turned toward Fourth Street which was the street the bus door faced. Fourth Street is behind the bus station which faces Trade Street (*Id.* 8, 9).

9. Faulkenberry testified that in his encounters with drug couriers they dress in a flashy manner, often look neat and fresh, and wear expensive clothes, expensive jewelry, and jackets. The Defendant was well-groomed and was wearing a gold chain. (*Id.* 11).

10. When the Defendant came off the bus and started to walk across the parking lot, Faulkenberry was looking for any bulges that might be inconsistent with the human anatomy, and he observed the Defendant staring at him for 15 or so steps. (*Id.* 11).

11. Stitt exited the bus and was 15 or 20 steps behind the Defendant. The Defendant, who was proceeding across the field of vision of Faulkenberry, turned his head and for 15 or 20 steps stared at Faulkenberry who kept eye contact with him. (*Id.* 12).

12. The Defendant walked in what appeared to be a hurry for 60 to 70 feet from where he exited the bus and stopped at a spare bus parked on the lot that was parked approximately 80 to 90 feet from the bus he had exited. Defendant then turned and looked at Faulkenberry and also at Mr. Stitt. (*Id.* 13, 14).

13. In the meantime Officer Witherspoon had arrived and had gotten out of his car and was standing on the other side of Faulkenberry's car, eight to ten feet away. (*Id.* at 14).

14. Stitt caught up with the Defendant and the Defendant said something to Stitt. Both the Defendant and Stitt then looked back at Faulkenberry. The Defendant and Stitt turned and walked together even more so in a hurry toward Fourth Street. (*Id.* 14).

15. When the Defendant exited the bus he was carrying a black bag and a blue bag by shoulder straps on his shoulders. Stitt had a blue bag. (*Id.* 15).

16. Faulkenberry got the attention of Witherspoon and Holbrook who had also observed the Defendant and Stitt. (*Id.* 16).

17. By now, the Defendant and Stitt were on Fourth Street and had turned to go toward South Tryon Street. (*Id.* 16).

18. The three officers proceeded behind the Defendant and Stitt and when approximately 10 feet behind them Faulkenberry asked if he could speak with them a minute. (*Id.* 16). This was at approximately 9:45 or 10 o'clock in the morning on Thursday, August 1, 1992. The Defendant responded "yes." Faulkenberry showed his identification and introduced the other officers who showed their identification. (*Id.* 17, 18).

19. The Defendant and Stitt were turned sideways with their backs to Fourth Street and the officers were facing Fourth Street. None of the officers were blocking the Defendant's and Stitt's way if they wished to proceed east up Fourth Street, the direction in which they had been walking. (*Id.* 18).

20. Faulkenberry told both the Defendant and Stitt that they were narcotic interdiction officers. Faulkenberry at that time noticed that the Defendant's hands were shaking. The Defendant was holding a magazine, the top of which was wavering very distinctly. Faulkenberry asked if they had any identification and both provided North Carolina identification cards. While looking at the cards, Faulkenberry could see from observing Defendant's shirt that the Defendant's heart was beating very rapidly thereby making his shirt move. Faulkenberry could also see the Defendant's abdomen moving in and out as he appeared to be breathing very hard, very deep. When asked where he had been, the Defendant said he had been to New York to buy martial arts equipment for his Kung Fu studio. When asked why he did not buy the equipment, he said it turned out to be "too expensive." (*Id.* 19, 20).

21. When Faulkenberry asked permission to search his bags, the Defendant did not answer "yes" or "no," but asked Faulkenberry if he had a search warrant. Faulkenberry answered he did not but was just seeking Defendant's cooperation. At that time Defendant became irate, loud and appeared to be upset, and said that Faulkenberry stopped him only because he was a young black male. (*Id.* 21).

22. The Defendant agreed with Faulkenberry that police should attempt to keep drugs out of Charlotte, but when asked again for permission to search his luggage, the Defendant answered "No, it's the principle of the thing." (*Id.* 22, 23).

23. The Defendant was still shaking, still breathing hard, appeared to be getting more and more nervous and dropped his magazine. He picked up the magazine and said "Am I free to leave?" Officer Faulkenberry told him "Yes, sir" that he was not under arrest. That he could do anything he wanted to. That he was free to leave, do whatever he wanted. The Defendant said "Well, I'm going to walk up the street." (*Id.* 23).

24. During this time, Officer Holbrook had been able to obtain a consent from Mr. Stitt and had searched him and his luggage. That search was negative. (*Id.* 23).

25. When the Defendant told Faulkenberry he was going to walk up the street, Faulkenberry told him "Well that's fine. I'm going to walk with you." The Defendant shrugged his shoulders, said "That's fine" and they both started to walk up Fourth Street. (*Id.* 24).

26. In the meantime, Stitt and Officer Holbrook had finished their conversation.

27. The Defendant, Faulkenberry, Officer Witherspoon and Mr. Stitt walked up Fourth Street with Witherspoon behind the Defendant and Stitt behind Faulkenberry. (*Id.* 24).

28. Faulkenberry asked the Defendant several times while walking up Fourth Street to allow him to search his luggage. The Defendant responded each time "No, you're not searching my bags."

29. During this time the Defendant told Faulkenberry he had been in New York five days whereas he had previously told him he had been there two days. (*Id.* 19, 25).

30. While walking the four blocks to Tryon Street the Defendant was on the street side of the sidewalk and Faulkenberry was on the building side, neither in front of nor behind the Defendant. (*Id.* 26).

31. During the walk up Fourth Street, Faulkenberry observed Sergeant Sennett go by in his car. When the group reached Tryon Street, Sergeant Sennett was standing by a light pole. Faulkenberry could see that Witherspoon spoke to Sergeant Sennett. Sergeant Sennett came over to where the Defendant and Faulkenberry were. (*Id.* 26).

32. It was approximately 20 minutes between the time of the first encounter with the Defendant and the walk of four blocks to Tryon Street. After Faulkenberry spoke with the Defendant, Faulkenberry was walking very slow and the Defendant was not passing him. The Defendant was staying with Faulkenberry, who would hesitate and talk for a second and then continue walking a little bit. The Defendant would slow down voluntarily when Faulkenberry did. Faulkenberry never requested the Defendant to slow down or stop after the initial conversation. They just took their time going up [to] Tryon Street [sic] (*Id.* 27).

33. There were buses on Tryon Street going north and south. The Defendant said he lived on Mellow Drive which is in a neighborhood at the north end of North Tryon Street. There was a bus facing south and the Defendant said he needed to get on and go home. (*Id.* 27, 28).

34. Faulkenberry was waiting at the bus station for buses coming from source cities. (Tr. 31, 32). Faulkenberry knew that bus No. 5255 was coming from New York and going to Dallas because he knew about what time the bus should arrive and when it should leave from the bus schedules. (*Id.* 44, 45).

35. Faulkenberry testified to his observations that raised his suspicion that Defendant had cocaine in his possession. These suspicions included Defendant's nervousness, his dress, his extended eye contact with Faulkenberry, and his behavior as he exited the bus. Faulkenberry concluded that Defendant was more nervous than just "a police officer speaking to me" kind of nervousness from observing Defendant's heart beat, deep breathing, and his shaking. Also, Defendant exited the bus with another person, separated, then appeared to be acting like they were not together when, in fact, they were. (*Id.* 45).

36. Officer Faulkenberry testified that he believed that he had enough information to detain Defendant's bags for a dog sniff before he ever reached South Tryon Street, but he was new on the Narcotics Interdiction Task Force and relied on Sergeant Sennett's expertise in making the final decision. (*Id.* 60).

37. Defendant did not offer any evidence at the suppression hearing before the Magistrate.

38. Sgt. Gerry Sennett of the Charlotte City Police Department for twelve years, with seven years in the Charlotte Vice Department and Supervisor of the Drug Interdiction Unit since February of 1991, testified that he was at the Charlotte Bus Station waiting the arrival of the bus from New York City. He was dressed in plain clothes, and carried a concealed weapon. He was called to the phone and while he was using it, he was advised by Officer Holbrook that Officers Witherspoon and Faulkenberry had been talking to two gentlemen and that they were walking up Fourth Street; and that they were going to request his assistance. Officer Holbrook also advised Sennett that the two people in question had come off the bus from New York, had acted like they were not together, and got together when they got near Fourth Street, and that they had made extended eye contact with Faulkenberry and Witherspoon. (*Id.* 62, 63).

39. Officer Holbrook further advised Sennett that when Faulkenberry and Witherspoon and Holbrook approached them on Fourth Street that one subject consented to a search of his person and luggage with negative results. Holbrook further advised Sennett that both subjects appeared very nervous and that the second gentleman, Mr. Stitt, appeared to be looking at the other black male who did not consent to a search. (*Id.* 64).

40. Sennett then went to his car and circled around and drove parallel to Fourth Street and saw Faulkenberry and Witherspoon walking up Fourth Street. (Fourth Street is a one-way street in the opposite direction to the way the Defendant and the officers were walking.) While Sennett was trying to find a place to park legally and not block traffic, he saw them walking up Fourth Street. Sennett had to circle around several blocks and finally found a place to park at Tryon and Fourth Streets, and was standing on the street corner when Witherspoon and Faulkenberry approached with the two suspects. (*Id.* 65).

41. Tryon Street is a busy street with a local city bus stop at the intersection with Fourth Street. There were numerous people on the street, the weather was sunny and warm that morning at approximately 10 or 10:15. (*Id.* 65, 66).

42. Sennett observed Faulkenberry walking with the Defendant. Faulkenberry walked past Sennett and Witherspoon came up to Sennett and told him some of the basic information he had about the circumstances. Witherspoon told Sennett again that they had both come off the bus from New York City. That they had engaged in conversation with him back down near the bus station. That he—the second subject that he was speaking with, Mr. Stitt, had consented to a search. That Mr. Stitt was very nervous; Mr. McFarley was very nervous. Mr. McFarley would not consent to the search. That he first stated he had been in New York City for two days, and then changed his story, saying he had been there five days. That he had traveled to New York City to buy some type of martial arts equipment, and that the

**710**

martial arts equipment was too expensive when he got up there. That he had turned around and come back on the bus to Charlotte. (*Id.* 66).

43. Once getting this information, Sennett walked over to where Mr. McFarley and Officer Faulkenberry were standing, which was near the bus stop. Sennett then identified himself to Mr. McFarley with his badge and I.D. and asked if he could speak with him for two minutes. Mr. McFarley turned to Sennett and said yes, and then Sennett engaged in conversation with him. (*Id.* 67).

44. Either Officer Witherspoon or Officer Faulkenberry advised Sennett that the Defendant had lived on Mellow Drive, which is up North Tryon Street. In talking with Defendant, he told Sennett he was going to catch a bus home, and pointed to a bus which was headed south on South Tryon Street, the opposite direction of where he was intending to go. That seemed odd to Sennett because to get to North Tryon Street, or to Mellow Drive off North Tryon Street, one has to take a bus north, not south. That is the opposite direction that Defendant was intending to go, if indeed he lived on Mellow Drive. That indicated to Sennett that that was not his correct address, that he did not live on Mellow Drive. Sennett then advised Defendant that he was going to detain his luggage at that time in an effort to get the drug dog to conduct a sniff test on the luggage, and that if the dog did alert on the luggage, Sennett was going to make an application for a search warrant. Sennett further advised Defendant that if the search warrant was signed by a judge, that the police would open the bag with the search warrant. (*Id.* 68). Sennett advised Defendant that he was free to stay with the luggage or he was free to go on about his business and the police would forward his luggage to him. Sennett asked him if the address that he gave Officer Faulkenberry was the correct, being Mellow Drive, address. He said that it was. Sennett recalls that Officer Faulkenberry asked him for the number of the exact address so they could for-

ward the luggage to him. Defendant told Sennett that he was not going to take his luggage, that he felt that Sennett was violating his rights. Sennett advised Defendant that if he was going to violate his rights, he would simply take the bag from him and open it up right there with or without his permission, and that he was not going to do that, and that in his mind he felt he had a reason to take the luggage, and that the police were going to conduct a sniff test with their drug dog. Defendant made a comment about, "Well, how do I know you're not going to put anything in the bag?" Sennett told him that he was free to stay with them and that he could observe what was going on to make sure that the police did not put anything in the bag, but that he was taking the luggage. Defendant then said, "Well, I'm going to call a lawyer." Sennett said, "That's fine. You can go talk to a lawyer, but your bags are staying with me." In talking with Sennett, the Defendant kept turning and looking down at the bag, and looking at Sennett. (*Id.* 68, 69). The bags were over Defendant's shoulder.

45. Finally, Defendant agreed. Sennett told Defendant he didn't want any problems in the middle of the street here or on the sidewalk, that he didn't want to see anyone hurt, but he was taking the luggage. Defendant then finally put the two bags down. He looked down at the black bag. The two zippers on the black bag were approximately four to five inches apart. He took the two zippers and put them together, completely sealing the bag. He then stated "If the drug dog does not alert or show that there's drugs in the bags, you're not going to open them?" Sennett said, no, if the drug dog did not alert, they would not open the luggage, and the police would take it to him or they would forward it to Defendant's address if that indeed was his address. (*Id.* 70). The Defendant gave his bags to Sgt. Sennett at about 10:13 a.m. (*Id.* 55).

46. It appeared to Sennett that Defendant closed the zipper because he did not want

the odor of whatever was in that bag to get out. Sennett then took the bags in his custody, and thanked Defendant and told him that he would get the bags back to him if indeed he was not able to get a search warrant or the dog did not alert on the bags. The police then turned and went back to Sennett's vehicle. Sennett handed the bags to Officers Faulkenberry and Witherspoon. The police turned, put them in the trunk of Sennett's vehicle, and then went back to the bus station. (*Id.* 70, 71).

47. The officers did not stay there and see that this Defendant got on the bus that he was speaking of because Sennett was concerned about the time element involved. Sennett knew that his dog handler, Officer Wallace, was not working that day. He was in a class, but he was at a class at the Law Enforcement Center [LEC], and Sennett felt he could still contact him but was worried about the time element because Sennett knew Wallace did not have the dog with him and that the police would have to go somewhere else to get this done. (*Id.* 71).

48. Sennett was concerned about the time element because the law, as he understood it, requires a time limit on it when luggage or bags are seized for drug sniffs. He knew the police could not take luggage and hold it for days at a time. And he was concerned about that time element to stay within the boundaries as he understood it. (*Id.* 71).

49. Sennett, Faulkenberry, and Witherspoon went down to the bus station. Sennett contacted Officer Wallace, who was in a class at the LEC, and advised him of the situation. Sennett made the decision that he would meet Officer Wallace. Wallace then left the class he was in. The police would meet Officer Wallace at a predetermined location where he could use his drug dog to conduct a sniff test. Sennett then left with Faulkenberry and Witherspoon to meet Officer Wallace a short time later. (*Id.* 72).

50. The bags stayed with Sennett, Faulkenberry, and Witherspoon in the trunk of Sennett's vehicle until Wallace took them in his custody to conduct the dog sniff.

It was done in all the police officers' presence at this other location. The bags were not opened at any time until the dog alerted to the bag, the search warrant was applied for and signed by the judge. Once the search warrant was applied for and once the judge signed it, both bags were opened. (*Id.* 72, 73). Sennett was there at that time and observed the black bag being opened. Officer Witherspoon took the contents of the black bag out. There was a brown paper bag. There were coffee grounds. There was a plastic bag, and there was some white material inside the plastic, which was down in the bottom of the black bag, and there were also clothes in there. (*Id.* 73).

51. There were coffee grounds in the bottom, inside the outer container of the bag. (*Id.* 73). There was found some identification and a motel receipt with Mr. McFarley's name on it indicating he was staying at a local motel a couple months prior. There was also identification in the blue bag with Mr. McFarley's name on it. There was a white substance inside the plastic bags, in the black bag.

52. In Sennett's opinion it was cocaine in two forms, cocaine in powder form and cocaine in base form, which is commonly called crack. (*Id.* 73, 74).

53. The white substance was later sent to the lab in Charlotte. Two lab reports were issued. The first lab report that came back did not distinguish between cocaine powder and cocaine base, and so Sennett asked them to make that distinction as it applied up in federal court differently than it does in state court. The chemist did that. The Charlotte–Mecklenburg Crime Laboratory showed the results or analysis of this particular material, which was seized from that black bag on August 1. It shows Item No. 1 being 450.4 grams of white substance which came back to be cocaine. Item No. 2, 212.4 grams of cocaine base. Item No. 3, 30.9 grams of cocaine base. In Sennett's opinion, it had a street value of $230,000 retail. (*Id.* 74, 75, 76).

54. That was later turned over to Witherspoon and Faulkenberry who took the drugs and the bags into their custody and turned the substance in to Property Control themselves. (*Id.* 76).

55. Sennett testified that he understood that recent law required just reasonable suspicion to detain the luggage not probable cause. (*Id.* 77). Sennett summed up the following facts he was aware of at the time he made his decision to detain the bags: "He exited a bus from a source city, being New York City. He walked hurriedly away from the bus. Another person who later they got together, he made it appear like they were not together. Then they did get together. Made extended eye contact with Officer Faulkenberry and also turned back looking at Officer Faulkenberry on a couple of occasions. He engaged in a conversation with a police officer, became immediately nervous, more nervous than a normal conversation with a law enforcement officer. His story was inconsistent on the amount of time he had spent in New York, taking a bus twelve to fifteen hours one way and turning around and coming right back within two days, 12 to 15 hours on a bus, then changing the story and saying he had been there five days. Going to New York City to buy martial arts equipment, on a bus that length of time, in my mind was suspicious. Getting martial arts equipment from New York City when most martial arts equipment can be bought anywhere else or through the mail, as most martial arts studios do get their equipment. Agreeing that police should do everything they can to keep drugs out of this particular city and agreeing with the community's help but refusing to be searched, which was his right. The combination of the other person looking at Mr. McFarley for answers in the original conversation before he answered any questions. Stating that he lived on Mellow Drive, which is off of North Tryon Street, but according to a bus he was traveling south saying that's where—he was on his way home and he was going on that bus. And then in my

engaging him in conversation, his extreme nervousness and looking down at the bags on several occasions when he was talking with me, indicated to me that there was probably controlled substances inside." (*Id.* 80, 81).

56. Sennett did not give the Defendant an exact time he expected to keep his luggage. Sennett told Defendant he would try to do it as quickly as he could. When Sennett asked him to go with the luggage, Sennett said "It's going to take us a little bit to get the dog to the bags. You're welcome to stay with us or you're welcome to leave." Defendant said he did not want to stay. (*Id.* 83).

57. Sennett told Defendant if he did indeed give him the correct address where he lived, he would forward the bags to him. Sennett also asked Defendant when he put the bag down, if he had a wallet or something in the bag that was important to him, if he wanted to open the bag and get the wallet, that was fine, he could do that. (*Id.* 84).

58. Officer Barry Wallace, the canine officer, testified to the method of having the dog sniff the bags, the fact that he alerted to the black bag and the blue bag, and that after the dog alerted, he obtained a search warrant from the Magistrate before he searched the bags. He further testified he was notified about 10:20 a.m. that he and the dog's services were needed, that he allowed the dog to sniff the bags, the first bag, the black bag, at 10:51 hours, and the second bag at 10:54 hours. He executed the search warrant in the Vice and Narcotics Office at 12:18. (*Id.* 87, 88, 89, 90).

## DISCUSSION

In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court upheld the authority of law enforcement officers to make "limited intrusions" on an individual's personal privacy based on a suspicion that does not rise to the level of probable cause. *Michigan v. Summers*, 452 U.S. 692, 698, 101 S.Ct. 2587, 2592, 69 L.Ed.2d 340 (1981). The Fourth Circuit Court of Appeals has defined the

nature and permissible scope of this intrusion, now known as a *Terry*-stop:

> A *Terry*-stop falls between a full-blown seizure requiring probable cause and a consensual encounter not implicating the Fourth Amendment, and is justified on less than probable cause because it is substantially less intrusive than a traditional arrest. The interests of crime prevention and detection and police officers' safety support the intrusion as reasonable, providing the police have a reasonable articulable basis for suspecting criminal activity.

*United States v. Alpert*, 816 F.2d 958, 960 (4th Cir.1987) (citing *Michigan v. Summers*, 452 U.S. at 697–699, 101 S.Ct. at 2591–2593).

When the issue of a *Terry*-stop arises, the Court must address three questions: whether and when the stop may have ceased to be a consensual encounter and become a seizure for the purpose of the Fourth Amendment; if a seizure occurred, whether the law enforcement officials had an articulable, reasonable suspicion that justified a seizure; and, whether the manner, means and duration of the seizure render it unreasonable. In the instant case, a seizure did occur when Sergeant Sennett informed Defendant that he was going to detain his bag in order for a dog to conduct a drug sniff.

The threshold issue in this matter is whether a seizure occurred before Defendant reached South Tryon Street. This issue is significant because of the general rule that the Government can only support a showing of reasonable suspicion with the information that it knew at the time of the seizure.

*Reasonable Suspicion for Seizure*

As noted above, there is no question that the Government had the right to approach Defendant and attempt to question him. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Defendant actually agreed to the initial approach and answered Officer Faulkenberry's questions. The Government need not have any suspicion of the person's involvement in wrongdoing in order to ask someone questions as long as

the encounter is consensual. *United States v. Wilson*, 953 F.2d 116, 121 (1991) (citation omitted). After a person has demonstrated that he does not wish to cooperate with the law enforcement officials, the Court must determine whether "the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen such that he is not free to walk away." *Terry v. Ohio*, 392 U.S. 1, n. 16, 88 S.Ct. 1868, n. 16, 20 L.Ed.2d 889 (1968). The Fourth Circuit applies an objective test to determine whether the Government has seized a person for Fourth Amendment purposes: "Whether a seizure occurred depends on the totality of the circumstances, and the test has an objective component to the extent that it is a reasonable person's interpretation of the police conduct that is determinative. In other words, if the hypothetical reasonable person would have felt free to ignore officer Crooke's questions and go on his way, no seizure occurred." *Wilson*, 953 F.2d at 121, (4th Cir.1991) (citing *United States v. Gordon*, 895 F.2d 932, 937 (4th Cir.1990) *cert. denied*, —— U.S. ——, 111 S.Ct. 131, 112 L.Ed.2d 98 (1990)).

*Wilson* involved an airport narcotics interdiction unit. The officers noticed a passenger disembarking a plane that they had under surveillance. The officers approached the suspect as he disembarked. The suspect cooperated and agreed to a search of his person and his baggage, but would not consent to a search of two coats that he was carrying. The suspect began walking through the airport and the officers accompanied him. The officers repeatedly asked him to allow a search of his coats. The suspect declined repeatedly before he finally consented to a search upon reaching the sidewalk outside the airport.

The court in *Wilson* held that the officers had seized the defendant sometime soon after he denied the agent's initial request to search the coat. *Wilson*, 953 F.2d at 123. More specifically, the court stated; "We hold that the officer's repeated requests to search the coats after Wilson's vigorous denials converted the encounter into a *Terry*-type seizure well before the

point at which Wilson held his coat out to be searched." *Id.* at 120. The court found the officer seized the suspect even though the officer did not physically block his movement and the suspect, in fact, continued to walk through the airport terminal as the officer questioned him. *Id.* at 122.

The apparent, broad holding of *Wilson* would convert any approach by law enforcement officers into a "seizure" as soon as the suspect declined to allow a search of his person or property. The court, however, also placed emphasis on the defendant's hostility toward the law enforcement officials after he declined to have his coats searched. As the court in *Wilson* recognized, the suspect expressed "an unequivocal unwillingness to engage in further conversation with the officer." *Id.* at 123.

After Wilson had declined to have his coats searched, the officers walked with him through the airport. The officers repeatedly asked Wilson for permission to search his coats. *Id.* at 118–119. Wilson denied these requests. Wilson responded "in an angry tone" to these requests. Wilson accused the officers of harassing him and stopping him. In the officer's words, "And he continued and continued to say that we were stopping him, harassing him. And his voice began getting very loud.... And this just persisted. And we had to ask him on numerous occasions to lower his voice and speak to us in a similar tone." *Id.* at 119.

The Magistrate recommended that the Defendant's motion to suppress be granted. The Magistrate reasoned that the facts and reasoning of *United States v. Wilson,* 953 F.2d 116 (4th Cir.1991) are directly on point with the facts and issues raised by this case. This Court does not agree.

■ The first issue is whether the officers' decision to "seize" the Defendant was based on reasonable suspicion.

In *Wilson,* the facts leading up to his seizure are summarized by the Magistrate as follows:

In *Wilson,* drug task force officers at the National Airport in Washington, D.C. approached Wilson as he came off of a flight from New York City and asked to speak with him. Wilson agreed to speak with them and consented to a search of his person and bags. After these searches, in which the officers found nothing unlawful, Wilson picked up two overcoats from a nearby chair. When one of the officers asked to search the coats also, Wilson refused and began to walk away. The officers followed Wilson out of the airport terminal and continued to ask him for consent to search the coats.[1] In response, Wilson became angry, accused the officers of harassing him, and repeatedly denied their repeated requests for consent to search the coats. Eventually, Wilson partially gave in to the officer's request and held out his coat to be frisked. After the officer felt a bulge in the coat, Wilson ran away, and was subsequently caught and arrested. After his arrest, the officers found over 100 grams of crack cocaine in the pocket of one of the overcoats.

In the case before the Court the officers' suspicions initially were raised by: (1) the Defendant and Stitt exiting the bus acting like they were not together when in fact they were; (2) the bus was from New York City, a "source city"; (3) the Defendant staring at Officer Faulkenberry; (4) when Stitt caught up with Defendant, Defendant said something to Stitt and both Defendant and Stitt looked at Officer Faulkenberry; (5) Defendant was well groomed and was wearing a gold chain; (6) when Defendant agreed to the officers' request to speak to them, and after Faulkenberry introduced the officers, Faulkenberry noticed the Defendant's hands were shaking; (7) the Defendant was holding a magazine which was wavering; (8) Defendant's heart was beating very rapidly and his abdomen was moving in and out; (9) the statement that he went to New York to buy martial arts equipment. All these factors together were sufficient to cause the officers in

1. The persistent nature of the officer's questioning is evident from the four pages of the Fourth Circuit's slip opinion where that Court set forth the actual testimony from the evidentiary hearing. *Wilson, supra,* 953 F.2d at 118–120.

their minds to have a reasonable suspicion that the Defendant had cocaine in his possession.

As was stated in *United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 695–696, 66 L.Ed.2d 621 (1981):

> ... when used by trained law enforcement officers, objective facts, meaningless to the untrained, can be combined with permissible deductions from such facts to form a legitimate basis for suspicion of a particular person and for action on that suspicion. We see here the kind of police work often suggested by judges and scholars as examples of appropriate and reasonable means of law enforcement....

Officer Faulkenberry testified that in his encounters with drug couriers they dress in a flashy manner, often look neat and fresh, wear expensive clothes, expensive jewelry and jackets. Defendant was well-groomed and wearing a gold chain.

In *Wilson* the court said on page 124:

> The necessary level of suspicion for a brief investigatory detention is appreciably less than the prerequisite level for a finding of probable cause. *Id.* [*United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)]. Even a series of lawful acts may, when viewed together, form the basis for reasonable suspicion. *Reid v. Georgia*, 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980). The observations of Officer Crooke do not satisfy this test.

> . . . .

> Crooke also did not attempt to link the bulge in Wilson's coat pocket to similar practices by other drug couriers. Thus, we are unable to draw any inferences that might otherwise be permissible had Crooke elaborated on the various factors that went into his decision to pursue Wilson. *See United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981) (police officer's special training and experience permits inference of criminal activity sufficient to create reasonable suspicion); *see also United States v. Gooding*, 695 F.2d 78, 82 (4th Cir.1982) (although trained law enforcement officers may be able to perceive suspicious conduct not visible to an untrained observer, "any such special meaning must be articulated to the courts and its reasonableness as a basis for seizure assessed independently of the police officers' subjective assertions...."). No such "special meaning" was articulated by Crooke, a police officer who had seven years of law enforcement experience, including 1½ years of experience with the airport drug interdiction task force.

This Court believes that Faulkenberry has articulated the various factors that form a legitimate basis for his decision to pursue this Defendant in contrast to the officer in *Wilson*. (Findings of Fact 1, 3, 5, 7, 9, 10, 11, 12, 14, 20, 23, 35). Thus, the Court finds that Officer Faulkenberry had a legitimate basis for his reasonable suspicion that this Defendant was engaged in drug courier activity and therefore concludes that the officer's initial approach and "seizure" of the Defendant was justified.

### Seizure of Defendant

Next, the question arises when, under *Wilson*, the seizure of the Defendant occurred.

In determining that the Defendant had been seized under *Wilson*, the Magistrate determined that "the consensual encounter ended when the Defendant refused to consent to a search, broke off the conversation, and began walking away. The officer's continued pursuit and questioning of the Defendant after this point was not consensual and amounted to a seizure of the Defendant."

This Court does not agree that the answer in this case is that simplistic.

To begin with, Officer Faulkenberry articulated a number of reasons that he believed created a reasonable suspicion that the Defendant was engaged in illicit drug activity and, therefore, justified the detention of Defendant's luggage before he reached South Tryon Street.

When the Defendant refused permission to the officers to search his luggage, dropped his magazine and picked it up, he asked "Am I free to leave?" Officer Faulkenberry told him "Yes, sir" that he was not under arrest and could do anything he wanted to; that he was free to leave, do whatever he wanted. Defendant then said, "Well, I'm going to walk up Fourth Street." Faulkenberry told Defendant, "Well, that's fine. I'm going to walk with you." The Defendant shrugged his shoulders, and responded "That's fine." They both started to walk up Fourth Street. During the walk to Tryon Street, Faulkenberry testified that he asked Defendant several times to allow him to search his luggage. To these requests the Defendant responded: "No, you're not searching my bags." Faulkenberry testified that during the walk up Fourth Street Faulkenberry was walking very slow and the Defendant was not passing him. The Defendant was staying with Faulkenberry who would hesitate and talk for a second and then continue walking a little bit. The Defendant would slow down voluntarily when Faulkenberry did. Faulkenberry never requested that Defendant slow down or stop after the initial stop. "They just took their time going up [to] Tryon Street [sic]." (Finding of Fact 32).

The Magistrate states in his opinion that: "Although the officer told the Defendant that he was going to walk with him and the Defendant said 'fine,' the undersigned does not take this response to be a blanket consent for the officers to follow him five city blocks through downtown Charlotte and repeatedly asking him for consent to search." Magistrate's *Opinion*, p. 12.

In *Wilson*, when the defendant started walking away and the officer was asking to search his coat, the defendant was replying in an angry tone that the officers were harassing him and were stopping him. *Wilson*, 953 F.2d at 118. There is no evidence in this case that the Defendant in any way became more upset with the officers while walking up to Tryon Street.

Faulkenberry had told the Defendant he was free to leave and go about his business after he refused to have his baggage searched behind the bus terminal. The Defendant then volunteered that he was going to walk up Fourth Street and when the officer said he would walk with him, the Defendant expressed no objection and said "fine."

If the Defendant at that time had said to the officer that he wanted to be left alone, and/or did not want the officer to accompany him, and the officers did accompany him the result may have been different.

In *Wilson*, 953 F.2d at 123, the court said:

By Officer Crooke's own testimony, Wilson "continued and continued to say we were stopping him, harassing him." Wilson twice refused Crooke's requests "in an angry tone," and "on numerous occasions" the agents had to ask him to lower his voice, however, "we [the agents] would start questioning him again, asking him the reason, [and] he would continue to escalate the volume of his voice." Again, Crooke testified that he and Officer Rogers had to ask him "numerous times" to quiet down. Wilson was so loud that "people ... began looking at us [a]nd some people had gathered." Yet after all this, Crooke said that when they reached the sidewalk, "we were persisting with the same questions."

.    .    .    .    .

Such prolonged questioning, leading as it did to the vigorous efforts by Wilson in response, is surely among the types of "egregious police behavior" that the Fourth Amendment is meant to deter. *United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 1588, 104 L.Ed.2d 1 (Marshall, J., dissenting).

In this case, there was no evidence that the Defendant conveyed an unwillingness to engage in conversation while walking up Fourth Street to Tryon Street. In fact, the Defendant would slow down when Faulkenberry did and was not passing Faulkenberry who was walking slowly. (Finding of Fact 32).

The court in *Wilson* refused to lay down a *per se* rule that subsequent efforts by the police to maintain contact with a suspect, after being rebuffed would amount to a seizure. *Wilson,* 953 F.2d at 123.

In *Florida v. Bostick,* —— U.S. ——, 111 S.Ct. 2382, 2389, 115 L.Ed.2d 389 (1991), the court said:

We adhere to the rule that, in order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.

Here, the Defendant was told he was free to leave and go about his business, and then consented to have the police officers accompany him to Tryon Street.

The Court concludes that when Officer Faulkenberry told Defendant he was free to leave, that under all the circumstances a reasonable person would have felt free to leave. The fact that the Defendant consented to allow the police to accompany him to Tryon Street does not change that.

In *Wilson,* 953 F.2d at 123, the court said:

A suspect's termination of what began as a consensual encounter does not in and of itself act to imbue any subsequent police contact with the degree of coerciveness necessary for a finding of a seizure, and subsequent contact by the police does not mean that the suspect has submitted. It is clear, however, that police persistence in such a situation strongly conveys, "when objectively viewed, an intention not to desist." *Guadalupe* [*v. United States* ], 585 A.2d [1348] at 1359 [ (D.C.App.1991) ].

The Court concludes that the officers' act of accompanying Defendant up Fourth Street toward Tryon Street did not create a seizure.

■ However, at some point while walking up Fourth Street to Tryon Street, the Court concludes that the Defendant was seized for Fourth Amendment purposes, under *Wilson,* when the officers continued to ask permission to search his luggage and the Defendant continued to refuse.

■ The next issue is whether Defendant's encounter with Officer Sennett at Tryon Street resulted in a separate, distinct seizure or merely an extension of Officer Faulkenberry's earlier seizure of Defendant.

The facts indicate that the Defendant consented to speak to Sennett, and Sennett engaged in conversation with him. Sennett told the Defendant that he was going to detain the baggage to allow the drug dog to conduct a sniff test on the luggage, and that if the dog alerted, he was going to make an application for a search warrant, and if the search warrant was signed by a judge he would open the bag. Sennett told the Defendant that he was free to stay with the luggage or to go about his business and that the police would forward his luggage to him. The Defendant said Sennett was not taking the luggage because he felt Sennett was violating his rights. Sennett told Defendant he didn't want any problems in the middle of the street or on the sidewalk and that he didn't want anyone hurt, but he was taking the luggage. The Defendant then put the two bags down. At that point, the Defendant was "seized" for Fourth Amendment purposes by Sennett.

After the officer seized the bags, he told Defendant that if the dog did not alert he would forward the bags to him. Sennett then took the bags into his custody and thanked the Defendant. The police then left the Defendant and went back to Sennett's vehicle. Sennett did not stay to see which bus, if any, the Defendant boarded because he was concerned about the time element involved in conducting the drug dog sniff.

The Findings of Fact set out the reasons for slight delay in finding the canine officer and having the dog sniff the bags. In summary, the canine officer was notified at 10:20 a.m. he was needed. The dog sniffed the first bag at 10:51 a.m. and the second

bag at 10:54 a.m. The search warrant was executed at 12:18 p.m.

The Defendant's baggage was detained from 10:13 a.m. to 10:51 a.m. or 38 minutes before the dog alerted to the first bag.

*Reasonableness of Seizure*

■ In *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110, the Supreme Court said that the law enforcement officers involved knew the time of Place's scheduled arrival at La Guardia, had ample time to arrange for their additional investigation at that location, and thereby could have minimized the intrusion on respondent's Fourth Amendment interests. The agents, however, did not arrange to minimize the intrusion of the seizure. They took the suspect's bags at La Guardia and removed them to Kennedy Airport for a sniff test by a trained narcotics detection dog. Approximately 90 minutes elapsed between the seizure and the drug dog sniff. Then, because it was late on Friday afternoon, the agents retained the luggage until Monday morning when they obtained a search warrant from a magistrate for the smaller bag, which when opened revealed cocaine. The Supreme Court held that under these circumstances the 90 minute detention of the defendant's luggage rendered the seizure unreasonable.

In the case before the Court the officers were not looking for this particular Defendant and did not know he was on the bus. The officers moved as swiftly as reasonably possible to have the dog sniff the bags and then to obtain the search warrant after the dog alerted.

The Court must consider whether the detention of the bags by Sennett for a drug dog sniff was reasonable under the circumstances when considered in conjunction with the initial seizure of Defendant by Faulkenberry. As an initial matter, the Court notes that a dog sniff by a highly trained narcotics dog is not a "search" within the meaning of the Fourth Amendment. *United States v. Place,* 462 U.S. 696, 708, 103 S.Ct. 2637, 2645, 77 L.Ed.2d 110 (1983). Sergeant Sennett's taking of the bag, however, did constitute a "sei-

zure." (*Id.* at 709–710, 103 S.Ct. at 2645–2646). The Court, therefore, will consider the taking of the bag as an extension of the earlier seizure of Defendant, if any, by Officer Faulkenberry for the purpose of determining whether the seizure is reasonable and within the *Terry* exception to the Fourth Amendment's requirement of probable cause.

■ The Court must consider the manner, means and duration of the seizure to determine whether it was reasonable. (*See id.* at 704, 103 S.Ct. at 2643) (must balance nature and quality of intrusion on individual's Fourth Amendment interests against opposing law enforcement interests). "[T]he brevity of the invasion of the individual's Fourth amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion." (*Id.* at 710, 103 S.Ct. at 2646). "[I]n assessing the effect of the length of the intrusion, we take into account whether the police diligently pursue their investigation." (*Id.*) In determining the reasonableness of a *Terry*-stop, the Court may also consider whether the law enforcement officers advised the suspect of how long his luggage would be detained and whether they made arrangements to promptly return the luggage to the suspect. (*Id.* at 711, 103 S.Ct. at 2646).

■ This case does not present precise evidence of when Defendant was seized. Defendant arrived at the Charlotte bus terminal at approximately 9:45 a.m. (Tr. at 4). At 10:13 a.m. Sergeant Sennett detained Defendant's bags in order to conduct a drug dog sniff. (*Id.* at 55). The officers contacted the drug dog handler at approximately 20 minutes after ten o'clock that morning. (*Id.* at 91). The officers arrived at the dog kennel at 10:44 a.m. (Tr. at 57). It took the officers 20–25 minutes to drive to the kennel. (*Id.*) The drug dog, George C385, alerted to the black bag at 10:51 a.m. (38 minutes after 10:13 a.m.) (*Id.* at 88, 91.) Part of the delay was due to the dog handler, Officer Wallace, being in a class that day. (*Id.* at 91.)

The Defendant was approached by the officers after he exited the bus and walked to Fourth Street. The Defendant refused to allow the officers to search his bags. The Defendant was then told he was free to go, and did not object to the officers walking up Fourth Street with him. During the walk, the officers again asked to search his bag. The Defendant again refused. Therefore, it was sometime after 9:45 a.m. when the officers again asked to search his bag, and he refused, that he was seized under *Wilson's* reasoning. However, for the purposes of the following analysis, the Court has used the time period of the arrival of the bus, approximately 9:45 a.m. to the alert of the dog to the first bag, 10:51 a.m., to arrive at the outside time of 66 minutes seizure time.[2]

The Court finds, therefore, that the entire, cumulative seizure period was between 38 and 66 minutes. The *Terry*-stop period was at the outside no longer than 66 minutes because the drug dog alerted to the first bag thereby establishing probable cause at 10:51 a.m.

Whether this 38 to 66 minute period was reasonable turns not just on the length of this period, but also on a number of other factors. *United States v. Alpert*, 816 F.2d 958, 964 (4th Cir.1987). These factors include a consideration of:

> "whether the police acted diligently; whether the detention of the subject of the search was unnecessarily prolonged; whether the authorities make it absolutely clear that they plan to reunite the suspect and his possessions at some future time, and how they plan to do it; and the importance of the governmental interest alleged to justify the intrusion."

In *Alpert*, the delay in obtaining the drug dog sniff was approximately 50 minutes. 816 F.2d at 963. More importantly, the court stated, we decline to adopt "a *per se* rule that the police keep their narcotics dogs at the airport whenever they are observing incoming flights for drug couriers." (*Id.*) This Court sees no reason why this rule would not apply equally to bus terminal surveillance.

In examining whether the police were diligent in this matter, the Court will examine the seizure as to these other factors both before and after the bags were detained even though the Court believes that only one seizure occurred. Initially Officer Faulkenberry seized Defendant on the sidewalk as they were walking up Fourth Street. This seizure appears reasonable for a number of good reasons: Officer Faulkenberry was inexperienced as a narcotics interdiction officer and testified that he wanted to rely on the expertise of Sergeant Sennett, (Tr. at 60); none of the officers interfered with Defendant's physical movement, (Tr. at 26); the "seizure" was brief, lasting only until the group reached Sergeant Sennett at South Tryon Street; Sergeant Sennett intercepted the group as soon as he was able.

The delay in detaining the bags was due to Faulkenberry's inexperience. Faulkenberry took the cautious route and waited for his much more experienced supervisor to determine whether to detain the bags. The Court would be amiss if it construed this behavior as a lack of diligence; rather, Officer Faulkenberry's caution insured that the seizure was as unintrusive as possible. The primary goal of the exclusionary rule is to discourage law enforcement officers from unlawfully invading the rights of citizens and other people. The obvious corollary to this rule is that the courts should not discourage behavior that tends to safeguard the people against intrusive, unlawful searches and seizures.

In addition, Sergeant Sennett made every effort to intercept the group as soon as possible. He was not able to intercept the group earlier, because, as he testified, he "could not find any place to park legally." (Tr. at 65). Lastly, the Court notes that although it has determined that under *Wilson* Defendant was seized while walking up Fourth Street, the nature of this seizure was minimally intrusive. Defendant was

---

**2.** It would have been helpful to the Court if the agents were more precise as to the time of the occurrence of various events.

allowed to continue to walk where he pleased and he presumably was walking in the direction that he would have been walking had he not encountered the police officers.

The second part of the seizure occurred when Sergeant Sennett detained the bags for a drug dog sniff. At that time, approximately 10:13 a.m., Sennett informed Defendant that "he was free to stay with the luggage or he was free to go on about his business and we would forward his luggage to him." (Tr. at 69). Officer Faulkenberry requested Defendant's exact address to which to forward the luggage. (*Id.*) Defendant was also advised that he could call a lawyer if he wished to do so.

The Government interest in this case, the interdiction of narcotic drugs, is a substantial interest. It is an interest of "great public importance." *Alpert*, 816 F.2d at 964.

The duration of the seizure in this case, between 38 and 66 minutes, is not unreasonable under the circumstances. Officer Faulkenberry acted wisely in waiting for his supervisor to determine whether to detain the bags. Sergeant Sennett, the supervisor, would have met the group before they had walked one block except that he could not find a parking space when he first saw the group behind the Federal Courthouse. The drug dog was not available readily because the canine officer, Officer Wallace, was in a law enforcement class at the time. Sergeant Sennett, however, testified that he was "concerned about the time element involved." (Tr. at 71). Instead of waiting for the canine officer to bring the dog to the scene, Sergeant Sennett met him halfway, at the dog kennel, and thereby reduced the time element to the best of his ability. (Tr. at 71–72). Only 38 minutes passed from the time that Sergeant Sennett seized the bags until the time that the drug dog alerted to the first bag, the black bag. (*Id.* at 55, 91).

The Court, therefore, finds that the temporary seizure of the Defendant and then his bags was not unreasonable under all the circumstances of this case. The seizure lasted between 38 and 66 minutes. Although the outside of this range may seem unreasonable under normal circumstances, the circumstances of this case warranted this amount of time. In addition, the Supreme Court has rejected any sort of *per se* time limit on *Terry*-type seizures and directed the lower courts to look to the totality of the circumstances. *United States v. Place*, 462 U.S. 696, 710–711, 103 S.Ct. 2637, 2646–2647, 77 L.Ed.2d 110 (1983).

NOW, THEREFORE, IT IS ORDERED that the Magistrate's Memorandum and Recommendation to grant the Defendant's motion to suppress be, and hereby is, REJECTED. IT IS FURTHER ORDERED that the Defendant's motion to suppress be, and hereby is, DENIED.