**UNITED STATES of America, Appellee,**

v.

**Jeffrey Scott ALPERT, Appellant.**

No. 86–5534.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 9, 1986.

Decided April 21, 1987.

Charles F. Atwood, III, on brief for appellant.

Max Cogburn, Jr. (Charles R. Brewer, U.S. Atty., Jerry W. Miller, Asst. U.S. Atty., on brief) for appellee.

Before WIDENER and PHILLIPS, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.

WIDENER, Circuit Judge:

Jeffrey Scott Alpert appeals from his conviction for possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Alpert contends that the cocaine found in his briefcase should have been suppressed as evidence because the search of his briefcase was tainted by violation of the principles of the *Terry* line of cases.[1] We disagree, and affirm the judgment of conviction.

At approximately 9:00 on the night of February 22, 1985, State Bureau of Investigation Officer J.A. Davis and Charlotte Police Officer Ronald Harkey were conducting surveillance of passengers deplaning from a flight from Miami, Florida, for the purpose of detecting illegal drug traffic. One of the first passengers to deplane, Kenneth Roberts (another defendant in this case), attracted the officers' attention with his loud and boisterous conduct. When Roberts came nearer to the officers, Harkey noticed that Roberts' pupils were dilated, despite the bright lighting in the airport. This, combined with Roberts' loud and boisterous behavior, led Harkey to suspect that Roberts was high on some type of stimulant.

Shortly thereafter, Officers Davis and Harkey saw Alpert and another man, Charles Nunn, deplane and join Roberts. Alpert also acted boisterously, and his pupils were dilated as well. The officers watched the three men for a short time, then spoke with the ticket agent, who informed them that Alpert had called her from Miami for her to make reservations from Miami to New York. Harkey and Davis watched the three while Roberts and Nunn went into a bar and Alpert waited outside with the luggage. After Nunn came out of the bar, the officers approached the men at the entrance to the airport bar, where Alpert and Nunn stood with the luggage. Harkey identified himself as a police officer and asked Alpert if he minded speaking with him. When Alpert agreed, Harkey asked to see Alpert's plane ticket. Alpert then produced three tickets, all in his name, for one-way flights from Miami to New York. The tickets had been paid for in cash, and none of them contained a baggage claim check.[2] Officer Harkey returned the tickets to Alpert, told Alpert that he was investigating narcotics traffic, and asked for permission to search Alpert and his briefcase. Alpert declined to consent, falling backwards, and commenced to sweat heavily. Sweat was coming through his shirt and beaded on his forehead. Harkey then told Alpert that he was going to detain Alpert's luggage in order to subject it to a canine sniff, but informed Alpert that he was not under arrest and that he was free to leave.

Roberts came back about that time and asked if he and his friends could wait while the sniff was conducted. Harkey replied that they could. After conferring, however, the men decided to continue on their flight to New York, which was scheduled to leave in 25 to 30 minutes. Harkey testified that if they had chosen to wait he would have conducted the sniff test "right

---

1. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Alpert pleaded guilty subject to his appeal of the district court's decision on the motion to suppress.

2. Officer Harkey identified these facts as elements of the drug courier profile. Alpert's departure from Miami and his destination in New York, source and distribution cities, also fit the profile. "The drug courier profile is an abstract of characteristics found to be typical of persons transporting illegal drugs." *Florida v. Royer*, 460 U.S. 491, 493, n. 2, 103 S.Ct. 1319, 1322, n. 2, 75 L.Ed.2d 229 (1983).

then." Since the three were not going to wait, there was no rush, he said. As the men walked away, officer Davis asked where the bag should be sent. The trio told him that they were not sure where they would be staying in New York. Officer Harkey finally stated that he would send it to J. Alpert in care of Piedmont Airlines in New York City if the dog did not alert to the bag. To this statement, Alpert made no response.

Since the officers had another flight under surveillance, Harkey locked the briefcase in the Narcotics Interdiction Office and returned to the concourse.[3] After completing the surveillance, Harkey took the bag to the dog at the Police Academy, which was located 10–15 minutes from the airport. Harkey hid the briefcase behind a drink machine in the Academy, brought the narcotics dog from the kennel outside, and released the dog at the entrance to the building, giving the dog the command to find drugs. The dog quickly found the bag and alerted to it. This was at 9:50 p.m., so approximately 50 minutes elapsed from the time Harkey seized Alpert's briefcase to the time when the narcotics dog alerted to the briefcase, at which point probable cause existed to hold the bag until a search warrant could be obtained. The warrant was obtained and the briefcase, when opened, was found to contain cocaine.

Alpert's appeal raises two issues, one, whether at the time Alpert was stopped there existed a reasonable, articulable suspicion that he was carrying drugs, and, two, whether the delay in conducting the dog sniff was so great as to exceed the brevity requirement of an investigative stop, thereby rendering the intrusion a more serious one requiring probable cause.

In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court upheld "the narrow authority of police officers who suspect criminal activity to make limited intrusions on an individual's personal security based on less than probable cause." *Michigan v. Summers*,

452 U.S. 692, 698, 101 S.Ct. 2587, 2592, 69 L.Ed.2d 340 (1981). A *Terry*-stop falls between a full-blown seizure requiring probable cause and a consensual encounter not implicating the Fourth Amendment, and is justified on less than probable cause because it is substantially less intrusive than a traditional arrest. The interests of crime prevention and detection and police officers' safety support the intrusion as reasonable, providing the police have a reasonable, articulable basis for suspecting criminal activity. *Summers*, at 697–699, 101 S.Ct. at 2591–2592.

■ In practical application, it is unclear what amount of police intrusion will cause a consensual encounter to ripen into an investigative stop requiring some objective level of justification. See, e.g., *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality). The Court has made clear, however, that a person is seized for Fourth Amendment purposes when, under the circumstances, a reasonable person would feel that he was not free to leave. *INS v. Delgado*, 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984); *Florida v. Royer*, 460 U.S. 491, 501–02, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983) (plurality opinion); plus, at 514, 103 S.Ct. at 1332, (Justice Blackmun dissenting).

Under the facts of this case, however, we have no need to ascertain at what particular moment Alpert was arrested, if indeed he ever was. Certainly, the encounter was a consensual one at the officers' first approach. And it is equally certain that the briefcase was seized when Officer Harkey told Alpert that he would detain Alpert's briefcase in order to subject it to the narcotics dog.

■ Small parts of the drug courier profile may not always, standing alone, provide the reasonable, articulable suspicion necessary to justify a *Terry*-stop. *Reid v. Georgia*, 448 U.S. 438, 440–42, 100

---

**3.** As the officers were conducting the other surveillance, they again spotted Alpert and his companions. After identifying themselves again, the men told the officers that they had decided to stay in Charlotte. When Officer Harkey asked where they would be staying in Charlotte, the men did not respond but instead continued on their way.

S.Ct. 2752, 2753–54, 65 L.Ed.2d 890 (1980) (per curiam). But in only slightly altered circumstances, with or without little else, they may: "[w]e agree with the State that when the officers discovered that Royer was traveling under an assumed name, this fact, and the facts already known to the officers—paying cash for a one-way ticket, the mode of checking the two bags, and Royer's appearance and conduct in general—were adequate grounds for detaining him and his luggage while they attempted to verify or dispel their suspicions in a manner that did not exceed the limits of an investigative detection." *Royer*, 460 U.S. at 502, 103 S.Ct. at 1326. Here, however, the unusual conduct and dilated pupils of Alpert and his companion[4] supplemented the drug courier characteristics observed by Officer Harkey and provided sufficient justification to stop Alpert and investigate further. All three tickets were paid for in cash; none of the tickets had baggage checks; none of the men had but little luggage, which they were carrying; all of the tickets were one way; all of the tickets were from Miami to New York, source and distribution cities for drugs; they all became very nervous when addressed, and Alpert fell back against the wall and broke out into a sweat that bled through his shirt and beaded on his forehead; one of the three deplaned among the first passengers, and the other two among the last; all of these are positive attributes of a drug courier in the drug courier profile. In addition, the eyes of Alpert and another were dilated, even in bright light, and Alpert was loud and boisterous. We are thus of opinion the officers here had as much or more evidence to rest upon as did the officers in *Place* in which the Court held that the initial holding of a bag for a dog sniff was permissible. Holding Alpert's bag for a drug sniff in this case was not a violation of the Fourth Amendment.

■ Alpert argues that, even if reasonable suspicion did exist to stop him, proba-

ble cause was nevertheless required to subject his bag to the sniffing dog. *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), however, clearly holds that a canine sniff does not constitute a search within the meaning of the Fourth Amendment. "[W]hen an officer's observations lead him reasonably to believe that a traveler is carrying narcotics, the principles of *Terry* and its progeny would permit the officer to detain the luggage briefly to investigate the circumstances that aroused his suspicion...." 462 U.S. at 706, 103 S.Ct. at 2644. Therefore, the sniff of Alpert's bag was not unlawful.

■ Our conclusion that reasonable suspicion existed to subject Alpert's briefcase to a canine sniff does not end our inquiry, however. Another issue is presented by Alpert's claim that, by detaining his luggage for 50 minutes, the officers exceeded the time limits of a *Terry*-stop and converted the seizure into one requiring probable cause, which did not exist until the dog alerted to the briefcase. The applicable brevity requirements for investigatory seizures of luggage are no different from those for seizures of persons in many cases since the seizure of a traveler's luggage may effectively disrupt travel plans and thus constitute a seizure of the person. See *United States v. Place*, 462 U.S. at 708–09, 103 S.Ct. at 2645.

■ Investigatory stops on less than probable cause are justified because they are substantially less intrusive than arrests. In analyzing a *Terry*-stop, the intrusiveness of the stop is the "critical threshold issue." *Place*, 462 U.S. at 722, 103 S.Ct. at 2652 (Justice Blackmun concurring in the judgment). The duration or brevity of the stop is a key consideration in determining its intrusiveness. See *Place*, supra, at 709, 103 S.Ct. at 2645. "Obviously, if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop." *United States v.*

---

4. Harkey's testimony on this point was as follows:

    Q: You say he was boisterous and loud?
    A: Yes, sir.
    Q: What do you mean?

A: He was laughing, people were walking by that evidently he didn't know and he was saying, Hey, yo, and this type of stuff, and just in a real high state.

*Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985). The resolution of this case turns on an application of the two Supreme Court decisions discussing the permissible length of a *Terry*-stop. Alpert argues that *United States v. Place*, supra, requires a finding that the length of the bag's detention was unreasonable. The government, on the other hand, maintains that the detention was justified on the authority of *United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985).

In *Place*, the defendant aroused the suspicion of drug agents as he waited in line in the Miami airport to buy a ticket to New York City. After questioning Place briefly, the agents allowed Place to leave, but checked out the information he gave them. The Miami agents then relayed their information to drug agents in New York. Upon Place's arrival in New York two hours later, Place was again confronted by agents. Place refused to consent to a search of his luggage, so the agents told Place that they were taking his luggage to a judge in order to get a search warrant. The agents told Place that he could accompany the agents if he wished, but Place declined, instead obtaining a telephone number where the agents could be reached. The agents took Place's luggage from LaGuardia Airport to Kennedy Airport, where a narcotics dog alerted to one of the bags. A search warrant was obtained, and cocaine was found in Place's luggage. Roughly 90 minutes had elapsed from the seizure of Place's bags to the dog's alert.

As we have noted, the Court held that the agents did not need probable cause in order to detain the defendant's bags for a sniff test. The Court stated, however, that the detention had to be brief and properly limited in scope. 462 U.S. at 706, 103 S.Ct. at 2644. With this in mind, the Court reversed Place's conviction, finding that the 90–minute detention of Place's bag exceeded the permissible limits of a *Terry*-stop, and hence became a seizure without probable cause in violation of the Fourth Amendment. In reaching this conclusion, the Court held that the length of time alone made the detention unreasonable in the ab-

sence of probable cause, although it refused to set a maximum time limit on investigative stops. 462 U.S. at 709, 103 S.Ct. at 2645. The court also noted, however, that in that case the police had unnecessarily prolonged the stop, since the agents knew of Place's arrival in time to arrange for a more prompt investigation. In so noting, the Court said that "in assessing the effect of the length of the detention, we take into account whether the police diligently pursue their investigation." 462 U.S. at 709, 103 S.Ct. at 2645.

In *Sharpe*, the Court was faced with a different set of circumstances. There, a DEA agent attempted to stop a pick-up truck and car traveling in company. As the agent's backup arrived, the truck sped up and the car pulled over to the side. The DEA agent stayed with the stopped car while the backup state trooper pursued the truck. The truck was stopped one-half mile down the road, and the DEA agent arrived 15 minutes later. After 5 minutes of investigation, the agent arrested the driver when he detected the aroma of marijuana around the truck's rear window.

The Court held that under the circumstances the 20–minute detention of the driver did not violate the brevity requirement of an investigative stop. The Court's opinion emphasized the reasoning in *Place* that identified police diligence as a factor in assessing the reasonableness of a stop's duration. Reiterating its view that no rigid time limitation applied to *Terry*-stops, the Court found that the police acted diligently, and distinguished *Place* on the ground that in *Sharpe* the police had not "*unnecessarily* prolonged [the ...] detention." 470 U.S. at 685, 105 S.Ct. at 1575 (italics are the Court's). The Court construed *Place* as follows:

[T]he rationale underlying that conclusion [that the detention was unreasonable] was premised on the fact that the police knew of respondent's arrival time for several hours beforehand, and the court assumed that the police could have arranged for a trained narcotics dog in advance and thus avoided the necessity

of holding respondent's luggage for ninety minutes.

470 U.S. at 684–85, 105 S.Ct. at 1575. In *Sharpe*, the Court found that the police conduct was made more reasonable by the fact that the police were acting "in a swiftly developing situation." 470 U.S. at 686, 105 S.Ct. at 1576. Furthermore, the Court emphasized that

> the delay in this case was attributable almost entirely to the evasive actions of Savage.... Except for Savage's maneuvers, only a short and certainly permissible prearrest detention would likely have taken place. The somewhat longer detention was simply the result of a 'graduate[d] ... respons[e] to the demands of [the] particular situation.' *Place*, supra [462 U.S.] at 709, n. 10 [103 S.Ct. at 2646, n. 10] ... We reject the contention that a 20–minute stop is unreasonable when the police have acted diligently and a suspect's actions contribute to the delay about which he complains." 470 U.S. at 687–88, 105 S.Ct. at 1576.

The duration of the delay in neither *Place* nor *Sharpe* dictate the result in this case, which seems to fall in between, somewhat closer to *Sharpe* than *Place*. Here, the delay was for 50 minutes, 40 minutes less than in *Place*, but 30 minutes more than in *Sharpe*. In *Sharpe*, the police were responding in a swiftly developing situation, while in *Place* the police had hours to prepare for an investigation of the suspect. Here, the officers were not specifically waiting for Alpert, but they were specifically looking for drug couriers. While the circumstances surrounding the detention of Alpert's briefcase did not constitute as swiftly developing a situation as did the facts in *Sharpe*, neither did the officers know in advance of Alpert's arrival as they did in *Place*. Like the time delay, then, this factor does not fall squarely within either case.

The officers in this case took steps to see that the stop was no more intrusive to Alpert than necessary. Alpert was given the opportunity to observe the sniff test, but he declined. Officer Harkey attempted to make arrangements to return Alpert's luggage; however, Alpert would not tell him where to send it. When Harkey told Alpert that he would send the briefcase to J. Alpert at LaGuardia Airport, in care of Piedmont Airlines, Alpert did not respond. In the context of a suppression motion, Alpert's silence can be taken as an indication that Officer Harkey's plan was agreeable to him, which would tend to make the detention more reasonable. We do not think that by observing another flight before conducting the dog sniff Officer Harkey unnecessarily prolonged the detention of the bag. In the first place, since Alpert seemed disinterested in the briefcase's speedy return, Harkey's actions seem perfectly reasonable. Furthermore, even if Harkey had gone to the Police Academy to conduct the test immediately, there is a question as to whether or not he could have conducted the sniff test in time for Alpert to make his flight. Harkey testified that it took 10–15 minutes to get to the Police Academy from the airport; he also testified that Alpert's plane was scheduled to leave in 25–30 minutes. Therefore, it would have taken at least 20 minutes to return Alpert's bag to him even if the test had been conducted by taking it immediately to the Police Academy. On the other hand, if the dog had been sent for, the bag could have been sniffed in slightly more than 10 minutes and the record reveals no reason why Alpert's travel plans would have been disrupted absent an alert by the narcotics dog. The record discloses no exploration of these alternatives, and we think that no inference can be drawn against the government by such omission.

Even if we assume that, by taking Alpert's briefcase to the Police Academy for the sniff test, Officer Harkey put Alpert in a somewhat difficult position, under the circumstances this was the only course available to Officer Harkey in order to conduct the sniff test, and we are of opinion the detention was not unnecessarily prolonged. Any other ruling would in effect require a *per se* rule that the police keep their narcotics dogs at the airport whenever they are observing incoming flights for drug couriers. This, we decline to do.

Although *Place* indicates, 462 U.S. at 709, n. 9, 103 S.Ct. at 2646, n. 9, that keeping narcotics dogs at airports would lessen the intrusive effect of the stop, and *Sharpe*, 470 U.S. at 685, 105 S.Ct. at 1575, indicates that so keeping the dogs would be evidence of diligence, we do not believe those references require the imposition of a *per se* rule requiring that narcotics dogs be kept at each airport where *Terry*-stops are used in the interdiction of drug traffic. It is obvious that lessening the duration of time lowers the intrusiveness, and one court has held that, where the delay was three hours, it was reasonable to expect to have a narcotics dog readily available. *Moya v. United States*, 745 F.2d 1044, 1050 (7th Cir.1984). But neither of the situations present in *Place* or *Moya* presents itself here. Had Alpert simply advised the officers that he wished to wait for his bag, the chances are that Harkey would have sent to the Police Academy for the narcotics dog and the dog would have sniffed the suitcase within 10 or 15 minutes from the time it was seized by Harkey, so Alpert's journey to New York would have continued uninterrupted, provided the dog did not alert. Even if we consider that Harkey would have taken the suitcase to the police academy to conduct the sniff test, that test would have been completed and the bag returned in only a little over either 20 or 30 minutes. In such event, Alpert might have been able to continue on his way to New York; the record is uncertain as to this. But Alpert's apparent agreement to let the officers send the bag to him in New York in care of Piedmont Airlines, indicating his disinterest in having his luggage accompany him, is bound to have been at once apparent. In these circumstances, we conclude that if Alpert did not occasion the delay by his actions, as in *Sharpe*, he certainly contributed to it, and there can be little doubt of this.

In sum, the Fourth Amendment forbids unreasonable searches and seizures. Whether or not a seizure is unreasonable depends on its intrusiveness, *Summers*, 452 U.S. at 697–698, 101 S.Ct. at 2591–2592. Whether or not a search or seizure is so intrusive as to violate the Fourth Amendment depends on all the circumstances of the case, *Place*, 462 U.S. at 710, 103 S.Ct. at 2646, and not usually on any hard and fast rule. Among the circumstances which must be considered are the duration of time the suspect is delayed by the stop, *Place*, *Sharpe*, supra; whether the police acted diligently, *Royer*, 460 U.S. at 500, 103 S.Ct. at 1325; whether the detention of the subject of the search was *unnecessarily* prolonged, *Sharpe*, 470 U.S. at 685, 105 S.Ct. at 1575; whether the authorities make it absolutely clear that they plan to reunite the suspect and his possessions at some future time, and how they plan to do it, *Place*, 462 U.S. at 708, n. 8, 103 S.Ct. at 2645, n. 8 (an aggravating factor if not done); and the importance of the governmental interest alleged to justify the intrusion, *Place*, at 703, 103 S.Ct. at 2642. While we do not hold that the considerations just recited are an exclusive list, we think they represent the thinking of the Court on the subject of *Terry* stops. In the case before us, as we have set out at some length above, the actions of the officers were in compliance with the requirements of the Court. They acted diligently; they did not unnecessarily delay Alpert; they made arrangements for his luggage, to which he apparently agreed; they did not search his person; and they did not, except for the brief moment when they took his bag, interfere with his movements at all, for Alpert continued on his way, unmolested except for the taking of his suitcase. The duration of time involved between the time the suitcase was taken and the time the narcotics dog alerted, 50 minutes, was no longer than the circumstances of the case required. The governmental interest, the interdiction of narcotics traffic, is of great public importance. *Royer*, 460 U.S. at 513, 103 S.Ct. at 1332 (Justice Blackmun dissenting, quoting Justice Powell concurring in *United States v. Mendenhall*, 446 U.S. 544, 561, 100 S.Ct. 1870, 1880, 64 L.Ed.2d 497 (1980). We are thus of opinion that the *Terry* stop involved here was not an unreasonable search or seizure.

The judgment of conviction is
AFFIRMED.