**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                        No. 94-5753

EARNEST CARTER, JR.,
Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
T. S. Ellis, III, District Judge.
(CR-87-17-A)

Argued: December 5, 1995

Decided: March 24, 1998

Before WILKINSON, Chief Judge, RUSSELL, WIDENER,
MURNAGHAN, ERVIN, WILKINS, NIEMEYER, HAMILTON,
LUTTIG, WILLIAMS, MICHAEL, and MOTZ, Circuit Judges, and
HALL, Senior Circuit Judge.

_____

Affirmed by published opinion. Judge Widener wrote the majority
opinion, in which Chief Judge Wilkinson and Judges Wilkins, Nie-
meyer, Hamilton, Luttig, Williams, and Motz concurred. Judge Ervin
wrote a dissenting opinion, in which Judges Murnaghan and Michael
and Senior Judge Hall concurred.*

_____

*Judge Russell heard oral argument in this case but died prior to the
time the decision was filed.

**COUNSEL**

**ARGUED:** Edward Blair Brown, BROWN & STAMBAUGH, Alexandria, Virginia, for Appellant. William Graham Otis, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** Helen F. Fahey, United States Attorney, John T. Martin, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

_____

**OPINION**

WIDENER, Circuit Judge:

The defendant, Earnest Carter, Jr., appeals his conviction after a guilty plea. The only issue is the district court's denial of his motion to suppress evidence of the cocaine found in his suitcase. We affirm.

Carter was arrested at Washington National Airport at approximately 10:30 p.m. on January 14, 1987 by Federal Aviation Administration police for the theft of a gray-brown Hartman brand suitcase, the property of one Thompson. The stolen suitcase and two other bags, a black carry-on bag and a gray Skyway brand suitcase with tape around it, were in Carter's possession and were taken from him at the time of his arrest. Carter had a roundtrip airline ticket showing his route from Miami to Washington on January 14 and returning to Miami on January 16. He told the police that he was in town to clarify a case of mistaken identity with the Washington police. Carter claimed that he had picked up the gray-brown Hartman bag by mistake and refused to give consent to the police to search the two other bags. The black carry-on bag was opened and inventoried by the arresting officer at 12:40 a.m. on January 15, but the gray Skyway bag was not opened. Carter appeared before a magistrate in the afternoon of January 15 and was released on an unsecured bail bond with penalty of $2500. In the meantime, the officers obtained Carter's criminal history which showed a prior charge of possession of a controlled substance with intent to distribute.

2

Following his release on bail Carter returned to the airport at about 4:30 p.m. on January 15 and requested the return of the black bag and the gray Skyway bag. He again refused consent to search the gray Skyway bag. The black bag was returned to him but the gray Skyway bag was held by police. At approximately 12 noon on January 16, a sniff dog alerted to the gray Skyway suitcase and the FAA police obtained a warrant to search the bag which was found to contain the 660 grams of cocaine, which form the basis of Carter's conviction.

Carter was indicted in February 1987 for larceny in violation of 18 U.S.C. § 661; possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1); interstate travel to promote unlawful activity in violation of 18 U.S.C. § 1952(a)(3); and failure to appear pursuant to conditions of release. He had obviously skipped bail, for he remained at large until arrested in the summer of 1994. The district court denied his motion to suppress the cocaine, finding that the property at issue was properly seized incident to a lawful arrest, that the government had a reasonable continuing investigatory interest in the property, and that the government did not hold the property for an unreasonably long time. Carter pleaded guilty to the failure to appear charge, and to the charge of possession of cocaine with intent to distribute on the condition that the suppression issue would be preserved for appeal. The government dismissed the remaining charges.

Carter appeals the denial of his motion to suppress, claiming that his property was held for an unreasonably long period of time without probable cause in violation of the Fourth Amendment. He asserts that although the property was lawfully seized at 10:30 p.m. on January 14, at the time he requested its return, 4:30 p.m. on January 15, there was no longer probable cause to believe that it was connected to the charge for which he was arrested or any other criminal activity.

We emphasize that there is no question concerning the validity of the search warrant, which was obtained when the sniff dog alerted. There is also no question concerning the officers having the sniff dog examine the gray Skyway suitcase.

At the suppression hearing in the district court, Carter's attorney stated to the court:

It has to do with only the timeframe--when he sought the release of his suitcase that I'm concerned.

The warrant, I think, is appropriate. The dog sniff I don't think is a search for constitutional purposes, and the rest falls in the place after that. It has to do only with their refusal to release it when there is no connection and no evidence that that bag, that suitcase, has anything to do with the criminal activity for which Mr. Carter was charged.

As stated, the only question before us is whether the holding of the gray Skyway bag from 4:30 p.m. on January 15 until noon on January 16 was unreasonable. <u>Weaver v. Williams</u>, 509 F.2d 884 (4th Cir. 1975) (only unreasonable searches and seizures are prohibited by the Fourth Amendment). The facts as found by the district court are not challenged and are for the most part stipulated. The reasonableness of a search and seizure is a legal conclusion which we review <u>de novo</u>. <u>United States v. Smith</u>, 30 F.3d 568, 571 (4th Cir.), <u>cert. denied</u>, 513 U.S. 1028 (1994). Carter admits that the bags were seized incident to a lawful arrest. At the time of his arrest, he had in his possession the gray-brown Hartman bag, the gray Skyway bag with tape on it, and the black carry-on bag. He was charged with the theft of the gray-brown Hartman bag and claimed that he had picked up the Hartman suitcase by mistake. So Carter had in his possession the three suitcases and only claimed the ownership of two of them. It is difficult to imagine more probative evidence of Carter's guilt than the three suitcases he had in his possession at the time of his arrest when he only claimed two of them. And the same would apply to evidence tending to show as false Carter's claim that he possessed the Hartman suitcase by reason of mistake.

We find no authority, and Carter offers none, that would obligate the officers to return to a criminal defendant charged with the theft, admissible evidence seized incident to a lawful arrest for the theft, prior to the disposition of the pending criminal charge for which the defendant was arrested. To repeat, the seizure of the bags was incident to a lawful arrest, not part of an investigatory stop.

Because the government had the right to retain Carter's gray Skyway suitcase as evidence in connection with the charge of theft of the

4

Hartman suitcase, we conclude that the detention of Carter's gray Skyway suitcase was reasonable. It had been seized incident to Carter's arrest, and the government was entitled to keep it to use as evidence at Carter's trial.

The judgment of the district court is accordingly

AFFIRMED.**1, 2**

_____

**1** The government argues that it was also entitled to retain possession of the suitcase for investigatory purposes and that the time the bag was so kept was reasonable; that there was sufficient reasonable suspicion to hold the bag until the sniff dog could examine it; and that in all events, the search was in good faith. Those are questions we need not decide.
**2** The position of the dissent, that the government's holding the bag in question was unnecessary, for a photograph could have been made of it, in our opinion, does not comport with either logic or practicality.

Coupled with the fact that Carter had both the gray and the Hartman suitcases in his possession when stopped is the fact that a simple comparison of them would have shown to a fact-finder, either court or jury, that Carter's stated reason for having the Hartman bag in his possession was entirely false. Since the government had in its possession the tangible evidence of the inadequacy of Carter's stated defense, no rule of law that we know of requires the government to depend on the less effective substituted evidence of a photograph. Anyone who has tried to defend a moonshiner in the face of the introduction into evidence of Mason jars of moonshine, rather than photographs, on a table in plain view of the jury will recognize the futility of such an undertaking.

Not only do reason and practicality compel the conclusion that the government was quite within its rights in holding on to the gray suitcase until the theft by Carter had been disposed of, that very point was made to the district judge at the hearing on the motion to suppress. Although the dissent quotes, at some length, different reasons advanced by the government for obtaining and keeping the suitcase, it does not quote that part of the hearing in the district court in which the very point made in the majority opinion was put up to the district judge.

> Mr. Martin: [an assistant U. S. attorney] . . . .
>
> And I go through those ["other reasons"] at page eight of my brief when I talk about the fact that down the road for purposes of a theft case, it may very well have been that we would want

5

ERVIN, Circuit Judge dissenting:

I respectfully dissent.

In this case, this court is asked to address an aspect of Fourth Amendment search and seizure jurisprudence that has not previously been decided in this circuit. Specifically, we must assess the reason-

_____

> to have the other bag because it would help us if the defendant were to say I took this bag by mistake. It might be helpful to us to be able to have a grey suitcase to show, wait a minute, ladies and gentlemen of the jury, he wouldn't take it by mistake by virtue of the fact that this other bag was there. (A.20-21)

This, in our opinion, is not "post hoc rationalization" as the dissent describes it at p.13, n.4.

Finally, the district court admitted the drugs into evidence because it believed that the time the suitcase was held was not unreasonable under the circumstances of this case. The judge said that holding the suitcase as "a nexus to the crime" of theft was too narrow a restriction on the government. As we have demonstrated, despite such narrow restriction the government complied with the more stringent standard. So we do not have to consider whether or not the more lenient standard of reasonableness has been met as a separate matter. What we must consider is whether the drugs were properly admitted into evidence. And they were, because the suitcase all the while was in the legitimate possession of the government.

> In the review of judicial proceedings the rule is settled that if the decision below is correct, it must be affirmed, although the lower court relied upon a wrong ground or gave a wrong reason.

Helvering v. Gowran, 302 U.S. 238, 245 (1937).

> It would be wasteful to send a case back to a lower court to reinstate a decision which it had already made but which the appellate court concluded should properly be based on another ground within the power of the appellate court to formulate.

SEC v. Chenery Corp., 318 U.S. 80, 88 (1943).

Because the drugs were properly admitted into evidence, the decision of the district court must be affirmed even if it gave a wrong reason, a question we do not decide.

6

ableness of the government's continued possession of a person's suitcase that was seized initially pursuant to a lawful arrest, once the owner has requested the return of his property. Although in this case I do not dispute the constitutional legitimacy of the initial seizure of the defendant's suitcase or its eventual search, I believe that the prolonged detention of the suitcase, coupled with the authorities' lack of diligence in pursuing their investigation, violated the defendant's Fourth Amendment right to be free from unreasonable seizures. In light of this constitutional violation, I would reverse the district court's denial of the motion to suppress.

I.

A.

The events in this case took place within a forty-eight hour period, beginning on the evening of January 14, 1987. At 10:30 p.m., Officer Michael Young of the Federal Aviation Administration Police (FAA) stopped Earnest Carter in a terminal at Washington National Airport based on the officer's suspicion that Carter had stolen a greyish-brown Hartman suitcase he was carrying. Unable to produce a baggage claim ticket for the suitcase in question, Carter was arrested and charged with larceny. Carter had in his possession at the time of arrest two other pieces of luggage--a small black bag and a larger, grey Skyway suitcase. Officer Young seized those bags, as well as Carter's round trip ticket from Miami to Washington, D.C. Carter does not contest the constitutional legitimacy of this initial seizure, which occurred pursuant to a lawful arrest.

It is most useful to divide the remaining events into two sections. The first of these periods covers the authorities' actions from the time of Carter's arrest at 10:30 p.m. on January 14 until 4:30 p.m. the next day, when Carter requested that his luggage be returned. The second time period, and the one most critical to Carter's constitutional claim, is the period between 4:30 p.m. on January 15, and 12:00 noon on January 16, when officers obtained the probable cause necessary to conduct a search of Carter's Skyway suitcase. At the time of Carter's arrest, FAA officers asked Carter to consent to a search of the two bags that Officer Young had seized during the arrest. FAA authorities informed Carter that without his consent, a search warrant would be

obtained. Carter refused to consent to a search. Within two hours, and without a search warrant having been obtained, FAA officers conducted an inventory search of Carter's small black bag. For reasons unexplained in the record, the officers chose to search the black bag, but not Carter's larger piece of luggage. The search of the black bag revealed nothing of any significance.

On January 15, while Carter was attempting to post bond on the theft charge, the FAA's investigation slowed down. Early in the day, Officer Young went to the United States Attorney's office to prepare a complaint on the theft charge. Young had been instructed by Detective Leach, who was heading the investigation, to inquire about obtaining a search warrant for Carter's Skyway bag. For some unexplained reason, Young never made such an inquiry. At 4:00 p.m., Detective Leach learned for the first time that no progress had been made in obtaining a search warrant. By this point, nearly eighteen hours had passed since Carter had been arrested.

At 4:30 p.m. on January 15, Carter returned to National Airport having just posted a $2,500 unsecured bond and sought the return of his two pieces of luggage. Detective Leach returned the small black bag to Carter that had been searched the night before. The detective was unwilling, however, to return the Skyway suitcase. Again, Carter declined to consent to a search of that piece of luggage. Thirty minutes after Carter's visit to National Airport, Detective Leach placed a phone call to obtain an application for a search warrant and learned that it would not be possible to obtain a warrant until the next day, January 16. Sometime later on the fifteenth, Detective Leach learned from an Assistant United States Attorney that a warrant would be issued only if airport authorities brought in narcotics dogs to sniff the Skyway bag. According to the U.S. Attorney's Office, without a dog alerting to the piece of luggage, there would not be probable cause to justify the issuance of a warrant.

Although Detective Leach knew of the dog-sniff requirement by the end of the day on the fifteenth, agents from the Drug Enforcement Agency did not bring a narcotics detector dog to the FAA police station to sniff the Skyway suitcase until noon on January 16. Nineteen-and-one-half hours after Carter had requested the return of the Skyway suitcase, the narcotics dog alerted to that piece of luggage. Carter

8

concedes that from then on, the authorities had probable cause to obtain a search warrant, which was secured three hours later. With search warrant in hand, authorities opened the Skyway bag and found 637 grams of cocaine.

The following month, in February 1987, Carter was charged in a four-count indictment, the most substantial charge being possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1).**1** This case comes to us much later, because Carter managed to evade authorities for seven years before being apprehended in the summer of 1994. At that point, pending trial on the four-count indictment, Carter filed a Motion to Suppress the cocaine found in the Skyway suitcase on the ground that the government's delay in obtaining a search warrant constituted an unreasonable seizure of Carter's belongings.

B.

After conducting a hearing on the motion, the district court concluded that the forty-eight hour period between Carter's initial arrest for theft and the authorities' discovery of cocaine was not an unreasonably long period of time for the government to retain Carter's property. United States v. Carter, 859 F. Supp. 202 (E.D. Va. 1994). The court began its analysis by drawing the important distinction between the challenge leveled by Carter and the more typical constitutional claim that arises under the Fourth Amendment. The court noted that the issue presented was not whether the eventual search of the Skyway bag was unconstitutional. Police dogs had detected the odor of drugs and a search warrant had been properly issued. Even more important, the district court recognized that whether an uncon-

_____

**1** As part of a plea agreement, Counts I and III of the indictment, which pertained to larceny (18 U.S.C. § 661) and to travel in interstate commerce with intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of an unlawful activity (18 U.S.C. § 1952(a)(3)) were eventually dismissed. Carter pled guilty to Count IV of the indictment, which charged him with failing to appear after having been released on conditions of recognizance in violation of 18 U.S.C. § 3146(a)(1). This appeal relates solely to Carter's conviction under Count II for illegal possession of cocaine.

stitutional seizure had occurred would not turn on the authorities' handling of the matter during the first eighteen hours that the Skyway bag was seized, but rather on the nineteen-plus hours from the time Carter requested the return of his luggage until the time the dogs were brought in to sniff the suitcase.

Relying on United States v. Premises Known as 608 Taylor Ave., Apartment 302, 584 F.2d 1297 (3d Cir. 1978), and Sovereign News Co. v. United States, 690 F.2d 569 (6th Cir. 1982), cert. denied, 464 U.S. 814 (1983), the district court attempted to "balance the government's interests in holding the property against the owner's right to use the property."[2] Carter , 859 F. Supp. at 204. According to the district court, where the government has a "continuing interest" in the property, lawfully seized property need not be returned immediately to the owner. Id. at 205. The government need only be sure that it does not hold the property for an "`unreasonable time' without taking some action with regard to the property." Id.

Here, the district court defined the government's "continuing interest" in terms of an alleged "ongoing criminal investigation" that was proceeding as to whether Carter was a drug trafficker. Id. The sum and substance of the authorities' suspicions regarding possible narcotics violations was the fact that Carter had been arrested previously for possession of a controlled substance with intent to distribute,[3] that Carter possessed a round-trip ticket from Miami--a known "source city" for drugs--with only a two day stay in Washington, D.C., and that the Skyway suitcase was wrapped with several pieces of tape, even though the suitcase's locking mechanisms were apparently in working condition. Id. at 204 n.3.

Having concluded that enough suspicion existed to justify a continued investigation on the part of FAA authorities, the district court

_____

[2] Unlike the district court, I do not find the Third and Sixth Circuits' decisions particularly instructive. Those cases were decided under Rule 41(e) of the Federal Rules of Criminal Procedure, and I have not found an instance in which either circuit has extended those holdings to a case similar to the one before us today.

[3] Airport authorities never learned whether Carter had been convicted on that previous charge.

10

undertook a very brief consideration of the reasonableness of "[t]he total elapsed time [forty-eight hours] between the time of the initial seizure of the suitcase and the issuance of the search warrant." Id. at 205. Importantly, the district court never distinguished, for purposes of its reasonableness analysis, between the period before Carter requested the return of his luggage and the period after such a request had been made. An independent inquiry was never made into the reasonableness of the nineteen hours between 4:30 p.m. on January 15 and 12:00 noon on January 16.

In an alternative holding, the district court ruled that even if the seizure were determined to have violated the Fourth Amendment, "the cocaine found in the suitcase is nonetheless admissible under the `good faith exception.'" Id. (citing United States v. Leon, 468 U.S. 897 (1984)). The court relied exclusively on the Eighth Circuit's decision in United States v. White, 890 F.2d 1413 (8th Cir. 1989), cert. denied, 498 U.S. 825 (1990), offering that case as an example in which the exclusionary rule was not permitted to prevent the admission of evidence where officers had had a good faith basis for seizing a person's property at an airport. Id. at 1419. The district court reasoned that because it is constitutionally permissible to seize property in the possession of an arrestee, the officers had acted in good faith in assuming that their continued holding of the property for "less than 24 hours before Carter's request for the return of the property" did not contravene the Fourth Amendment. Carter, 859 F. Supp. at 206. Notably, the district court did not conduct a separate "good faith" inquiry into the officers' motives for holding the Skyway suitcase for the additional nineteen hours after Carter had made a formal request for the return of his luggage.

Facing the prospect of the cocaine being admitted as evidence against him, Carter entered into a plea of guilty as to the possession charge. The guilty plea was made on the condition that the suppression issue would be preserved for appeal. Carter received a sixty-month sentence for his § 841(a)(1) conviction and an additional one month for having violated 18 U.S.C. § 3146(a)(1). Following sentencing, Carter filed a timely notice of appeal.

II.

Like the district court, I begin by noting that the question presented in this case is substantially different from the questions typically pres-

ented in Fourth Amendment search and seizure cases. First, Carter is not claiming that <u>he</u> was unlawfully seized when officers first approached him on January 14. <u>See Florida v. Royer</u>, 460 U.S. 491, 497 (1983) (plurality opinion) (holding that "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions"). Second, Carter does not dispute that it was within the powers of FAA authorities to seize his luggage at the time of his arrest on January 14. Once the validity of the arrest is established--something in this case that Carter does not dispute--the subsequent seizure of luggage was "unexceptionable as permissible incidents to a valid arrest." <u>United States v. Lehmann</u>, 798 F.2d 692, 695 (4th Cir. 1986). Finally, Carter is not challenging the legitimacy of the January 16 <u>search</u> of the Skyway suitcase. Once the narcotics dogs alerted to the Skyway bag, probable cause existed and a search warrant was properly issued. Carter's case is less common--one in which the sole complaint is that the defendant's <u>property</u> was seized for an unreasonably long period of time, despite efforts on his part to get it back.

As a final preliminary matter, it must be determined which portion of the forty-one hours between Carter's arrest and the search of his Skyway suitcase is subject to constitutional scrutiny. I do not understand Carter as complaining about the initial delay from 10:30 p.m. on January 14 through 4:30 p.m. on January 15. It was not until late afternoon on the fifteenth--after he had spent the better part of a day in custody and in front of a magistrate judge seeking to be released on bond--that Carter was even in a position to request that his bags be returned to him. As a result, Fourth Amendment concerns were not triggered until January 15, at 4:30 p.m., when Carter requested the return of his luggage. Likewise, Fourth Amendment concerns could not have extended beyond 12:00 noon on January 16, when the DEA narcotics dogs sensed an odor of drugs coming from the Skyway bag, thus providing authorities with probable cause to obtain a search warrant. Hence, the constitutional examination involves the nineteen-and-one-half hour period between 4:30 p.m. on the fifteenth and 12:00 noon on the sixteenth.

12

Carter maintains that the government can only justify holding on to seized property once an owner has requested its return by demonstrating that its "continuing interest" in the seized property relates to the crime for which the arrestee was initially arrested. Under such a theory, unless the FAA officers could have articulated a reason for detaining the Skyway suitcase that related to their investigation of Carter's theft,[4] Carter would have been entitled to his suitcase as soon as he requested its return. Like the district court, I find Carter's formulation of the rule too narrow. Carter, 859 F. Supp. at 205 n.6. The government's "continuing interest" in the luggage need not be directly related to the crime for which the defendant was arrested. Assuming that the "continuing interest" is distinct from the initial basis for arrest, it must then be determined what constitutes a reasonable amount of time for the authorities to continue to hold on to the seized property. While the officers need not return the property immediately

_____

[4] I find wholly unavailing the government's admittedly post hoc rationalization that the continued seizure of the Skyway could have proved useful in undermining Carter's claim that he had picked up the Hartman suitcase by accident, because it looked like his own Skyway suitcase. At the suppression hearing, government counsel admitted that Detective Leach's decision not to give Carter the Skyway had nothing to do with the perceived value the suitcase might have had in a subsequent prosecution on the theft charge:

> "[W]hat he [Detective Leach] had in his mind at the time was that the defendant had just come in from Miami, a known drug source for a quick stay, that the defendant had a prior drug arrest, that the zippered bag looked suspicious, because it had tape on the outside of it."

Joint Appendix, at 19-20. Counsel further conceded that had FAA authorities only been interested in the Skyway for the purpose of bolstering their case against Carter on the theft charge, they could just as easily have taken a photograph of the suitcase and returned the bag to Carter.

Whether producing the Skyway at trial would have been necessary is doubtful. While it certainly is possible for someone to mistake another person's suitcase for his own and to walk off accidentally with the wrong piece of luggage, it strains credulity to believe that Carter had forgotten how many pieces of luggage he had brought with him on his trip. At the time he was stopped by Officer Young, Carter was attempting to leave the airport with his Skyway and the similar Hartman.

13

upon the arrestee's request, as Carter suggests, I take exception to the length of time the district court was willing to allow the seizure to continue without a finding of probable cause.

I will assume, for purposes of discussion, that there existed a reasonable basis for suspecting Carter of illegal activity beyond the theft of the Hartman suitcase.**5** When such suspicion exists, under United States v. Place, 462 U.S. 696 (1983), authorities may briefly detain a person's luggage for the purpose of conducting a limited investigation of that person's property.**6** In Place, the Court specifically upheld

_____

**5** While Carter's arrest for theft and prior arrest on drug possession charges may have given the police some basis to suspect further illegal activity, I am less inclined to read much, if anything, into the fact that Carter's Skyway was wrapped with several pieces of tape even though there was apparently no damage to the suitcase's zippers or locking mechanisms. The notion that reasonable suspicion can be gleaned from the fact that Carter had flown into Washington, D.C. from Miami and that he was staying for only two days is even less plausible. I do not dispute the fact that Miami, along with many other major metropolitan centers throughout this country, has substantial drug problems, but the idea of law enforcement authorities conducting investigations based on the air travel of a suspect is dubious at best, particularly when the destinations are in fairly reasonable proximity to one another. Cf. United States v. Alpert, 816 F.2d 958, 960-61 (4th Cir. 1987) (noting that "[s]mall parts of the drug courier profile may not always, standing alone, provide the reasonable, articulable suspicion necessary to justify a Terry-stop"); see also United States v. Gooding, 695 F.2d 78, 83 (4th Cir. 1982) (rejecting notion that a drug courier profile alone, which included defendant's arrival from New York--a source city for drugs--could create a reasonable and articulable suspicion); but cf. United States v. Erwin, 803 F.2d 1505, 1510 (9th Cir. 1986) (including in list of suspicious activity the fact that defendant had flown 4,000 miles round-trip from Alaska to San Francisco--"a known drug-source city"--in a two day period).
**6** The Supreme Court's decision in Place is far more relevant to the outcome of this case than was suggested by the district court. See Carter, 859 F. Supp. at 204 n.4 (citing Place only for the proposition that a "dog sniff is not a Fourth Amendment `search'"). I recognize that, on first glance, there appears to be a substantial distinction between the seizure in this case and the one in Place, but after careful consideration I find that Place is appropriately applied in this instance. The government dis-

the constitutional legitimacy of using narcotics detection dogs to ascertain whether luggage contains contraband. Relying on its decision in <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), the Court carved out another exception to the probable cause requirement for limited seizures and held that the detention of personal effects is governed by the same standards as the seizure of a person in possession of those goods.

_____

tinguishes <u>Place</u> on the ground that Carter's luggage was initially seized incident to a lawful arrest, whereas Place--although suspected of illegal activity--had not been arrested prior to the seizure of his luggage. The fact that Carter had attracted the attention of airport police by stealing someone else's suitcase plays a critical role in defining the amount of time that authorities could hold on to Carter's luggage, but only up until that point when Carter was released on bond and requested the return of his luggage. By 4:30 p.m. on January 15, authorities could not articulate a basis for keeping the Skyway as part of their investigation into the prior evening's theft. At best, the officers then were only suspicious of other criminal activity.

The government relies too heavily on the fact that FAA authorities initially seized Carter's property pursuant to a lawful arrest. At the motions hearing, government counsel argued that "[t]he fact of the lawful seizure places the reasonable period of time in a much more expansive framework [than would otherwise be the case under a scenario such as the one in <u>Place</u>]." <u>Joint Appendix</u>, at 24. In front of this court, the government continued to distance itself from <u>Place</u> by claiming that a reasonable period for retaining a bag after it has been lawfully seized is longer than that which constitutes a "reasonable period" under <u>Place</u>. In fact, the government contends that the seizure of property incident to an arrest allows the government a certain amount of time to "simply sit back and think about it." The government ignores the fact that it had eighteen hours to "sit back and think" about its investigation.

Had Carter claimed that the initial eighteen hour seizure of his property violated the Fourth Amendment, there would be no basis for our assessing the reasonableness of the officers' actions in light of <u>Place</u>. I recognize that <u>Place</u> does not address the detention of property seized incident to a lawful arrest. In this case, however, we are not evaluating the initial seizure, but the continued seizure of Carter's belongings once he requested the return of his luggage after having been released on bond. At that point, I believe that this case fell squarely back within the parameters of <u>Place</u>.

15

Place, 462 U.S. at 700-01, 705; United States v. McFarley, 991 F.2d 1188, 1191 (4th Cir.) (recognizing that under Place, the "same reasonable suspicion which must justify a brief stop and search of the person must also form the basis for a detention of luggage for the purpose of conducting a dog sniff"), cert. denied, 114 S. Ct. 393 (1993).

Place rejected the government's contention that seizures of property are necessarily less intrusive than seizures of the person. A . . . "detention of luggage within the traveler's immediate possession . . . intrudes on both the suspect's possessory interest in his luggage as well as his liberty interest in proceeding with his itinerary." Place, 462 U.S. at 708. The Court analogized the situation involving the seizure of luggage to the situation in which the person himself is seized:

> when the police seize luggage from the suspect's custody, . . . the limitations applicable to investigative detentions of the person should define the permissible scope of an investigative detention of the person's luggage on less than probable cause.

Id. at 708-09. As in the Terry context, it is possible for officers to exceed the time limits of an investigatory stop with respect to personal property. As we noted in United States v. Alpert, 816 F.2d 958, 961 (4th Cir. 1987), "[t]he applicable brevity requirements for investigatory seizures of luggage are no different from those for seizures of persons in many cases."

In analyzing a stop based on reasonable suspicion, the intrusiveness of the stop is the "critical threshold issue," Place, 462 U.S. at 722, and we have held that the "duration or brevity of the stop is a key consideration in determining . . . [the stop's] intrusiveness." Alpert, 816 F.2d at 961. In Place, ninety minutes elapsed between the officers' initial detention of the defendant and his luggage and the "sniff test" by trained narcotics dogs. The detention of the defendant's luggage for that amount of time, when the defendant had not been arrested, but had been stopped based only on the officer's suspicion that he may have been involved in criminal activity, was ruled excessive. Id. at 709-10. In making such a determination, the Place Court took into account "whether the police diligently pursue[d] their investigation," and thereby minimized any intrusion on the traveler's Fourth Amend-

16

ment rights. Id. at 709; Alpert, 816 F.2d at 962. In arriving at the conclusion that the ninety-minute detention of Place's luggage constituted an unreasonable seizure, the Court expressly noted the lack of diligence on the part of the officers in securing the necessary narcotics dogs. Place, 462 U.S. at 709. The fact that ninety minutes had transpired before the dogs were brought to sniff the luggage was less critical than the fact that the officers had not made a sufficient effort to minimize the intrusiveness of the detention. Id. at 703.

Two years after its decision in Place, the Court reiterated the importance of police diligence in the investigatory process. United States v. Sharpe, 470 U.S. 675 (1985). The Sharpe Court construed Place as follows:

> [T]he rationale underlying that conclusion[that the detention was unreasonable] was premised on the fact that the police knew of respondent's arrival time for several hours beforehand, and the Court assumed that the police could have arranged for a trained narcotics dog in advance and thus avoided the necessity of holding respondent's luggage for 90 minutes.

Sharpe, 470 U.S. at 684-85. In contrast to the lack of prompt police action in Place, the twenty minute detention in Sharpe was justified in light of the fact that police had been acting "in a swiftly developing situation." Id. at 686. Furthermore, the twenty minute detention was primarily the fault of the suspect, whose "actions contribute[d] to the added delay about which he complains." Id. at 687-88.

Against the backdrop of Place and Sharpe , we articulated a list of circumstances to be considered when evaluating the intrusiveness of a seizure for Fourth Amendment purposes. In Alpert, we included among those circumstances (1) the duration of time the suspect is delayed by the stop; (2) whether the police acted diligently; (3) whether the detention of the subject of the search was unnecessarily prolonged; (4) whether the authorities made it absolutely clear that they planned to reunite the suspect and his possessions at some future time, and how they planned to do it; and (5) the importance of the governmental interest alleged to justify the intrusion. 816 F.2d at 964 (citations to Place and Sharpe omitted). When considered in light of

17

these criterion, the officers' actions--specifically those taken beyond the point at which Carter requested that his luggage be returned to him--were not reasonable.[7]

With respect to the first of the Alpert criteria, I reject Carter's intimation that the court need only determine whether his belongings were detained for longer than the ninety minute period held excessive in Place. The Place Court "decline[d] to adopt any outside time limitation for a permissible Terry stop," id. at 709, focusing instead on whether the seizure was "so minimally intrusive as to be justifiable on reasonable suspicion." Place, 462 U.S. at 709; see also Royer, 460 U.S. at 500 (holding that "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time"). While the Court had "never approved a seizure of the person for the prolonged 90-minute period involved here," Place, 462 U.S. at 709-10, I recognize that it is possible for officers to act with due diligence, yet exceed ninety minutes in conducting an investigation. I note, however, that virtually all courts upholding seizures of property have done so where the detention lasted for less than ninety minutes. See, e.g., Frost, 999 F.2d at 741 (80-minute detention of suitcase for sniff test reasonable when police acted diligently); McFarley, 991 F.2d at 1194 (38-minute detention of luggage reasonable when taken directly to dog sniff testing and investigation conducted diligently); United States v. Withers,

_____

[7] Although my attention in this case focuses on the time period beginning at 4:30 p.m. on January 15, when Carter first requested the return of his luggage, I cannot ignore that earlier that day Detective Leach had asked Officer Young to inquire about obtaining a search warrant for the Skyway bag. It is reasonable to assume that had Officer Young made such an inquiry, he would have discovered what Detective Leach was eventually told at the end of the day on the fifteenth--that a warrant would not be issued unless narcotics detection dogs were brought in to sniff the suitcase. In making my evaluation, I must also consider briefly one other aspect of the officers' conduct prior to Carter's 4:30 p.m. request. Although I believe Carter overemphasizes the importance of the officers not finding any contraband in the black bag that had been inventoried at 12:40 a.m. on January 15, the fact that the bag was cleared should have had some impact on the diligence with which the officers continued their investigation, since it was certainly possible that the Skyway suitcase also would fail to produce any contraband.

18

972 F.2d 837, 843 (7th Cir. 1992) (15- to 20-minute detention of suspect's luggage for sniff test reasonable); United States v. Glover, 957 F.2d 1004, 1012 (2d Cir. 1992) (30-minute detention of luggage reasonable); United States v. Cooper, 873 F.2d 269, 275 (11th Cir.) (per curiam) (35-minute detention of luggage reasonable when officers diligently pursued investigation, found dog to perform sniff test, and obtained search warrant as soon as practicable), cert. denied, 493 U.S. 837 (1989); United States v. Quinn, 815 F.2d 153, 157-58 (1st Cir. 1987) (20-minute delay reasonable given diligence of police); Erwin, 803 F.2d at 1509 (45-minute delay from time defendant stepped off flight until police-trained dog detected drug odor from defendant's day pack was not unreasonable for constitutional purposes); but see Respress, 9 F.3d at 488 (10-hour detention of luggage reasonable considering late hour and time needed to prepare affidavit and have it reviewed in order to obtain search warrant). Similarly, when the detention of luggage has equalled or exceeded 90-minutes, courts have generally held such seizures unconstitutional without probable cause. See, e.g., United States v. Scales, 903 F.2d 765, 769 (10th Cir. 1990) (seven hour delay found to have gone beyond the "brevity" required for a Place seizure); United States v. Cagle, 849 F.2d 924, 927 (5th Cir. 1988) (90-minute detention rendered seizure sufficiently intrusive); Moya v. United States, 761 F.2d 322, 327 (7th Cir. 1984) (three hour seizure of shoulder bag unreasonable); United States v. Puglisi, 723 F.2d 779, 790-91 (11th Cir. 1984) (two hour and twenty minute detention of luggage rendered seizure unreasonable). The few instances in which courts have upheld seizures far exceeding ninety minutes are readily distinguishable from the present case. See Segura v. United States, 468 U.S. 796 (1984) (19-hour seizure of contents of apartment based on probable cause, rather than mere reasonable suspicion); United States v. Van Leeuwen, 397 U.S. 249 (1970) (26-1/2 hour seizure of mailed package allegedly containing gold coins did not trigger type of possessory and liberty interests attached to personal luggage of a traveler).

In each of the cases cited above, the degree of diligence with which the officers proceeded was as or more important than the number of minutes taken to complete the sniff tests. See Place, 462 U.S. at 709 (instructing that courts must "take into account whether the police diligently pursue[d] their investigation"); Alpert, 816 F.2d at 964 (including "diligence" as second of five bases for evaluating reason-

19

ableness of prolonged seizure). In the instant case, Detective Leach learned of the "sniff test" requirement by the end of the day on January 15, yet dogs were not brought in until noon on January 16. Importantly, the government concedes that dogs could have been brought in more quickly. At no point, however, has the government offered an explanation as to why it took nineteen hours for narcotics detection dogs to be brought to FAA offices to sniff Carter's Skyway bag. Under the third prong of Alpert, I believe that the detention of the Skyway was unnecessarily prolonged.

Nothing about the handling of Carter's luggage from the time he requested its return strikes me as reasonable. On its face, a nineteen-and-one-half hour delay triggers substantial suspicions about the efficacy with which the officers conducted their investigation. The government has provided no basis for concluding that FAA authorities acted in a diligent fashion or to believe that the sniff test could not have been conducted twelve to eighteen hours sooner. Therefore, I believe that the prolonged detention of Carter's belongings constituted an unreasonable seizure under the Fourth Amendment.

III.

I do not accept the argument that the cocaine found in Carter's Skyway bag is nonetheless admissible under the "good faith exception" to the exclusionary rule first articulated in United States v. Leon, 468 U.S. 897 (1984). Leon is simply not applicable to this case. The Leon Court substantially modified the Fourth Amendment's exclusionary rule by holding that the rule should not be applied to bar the use in the prosecution's case-in-chief of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate, but ultimately found to be invalid. Leon, 468 U.S. at 905-25. The practical effect of Leon has been to enable prosecutors to preserve cases that would have otherwise failed for lack of evidence. I refuse to extend Leon's "good faith exception" beyond its limited holding. According to the Leon Court, the exclusionary rule was designed to "deter police misconduct rather than to punish the errors of judges and magistrates." Id. at 916. As such, the Court found that "[p]enalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." Id. at 921. Other circuits have rejected the govern-

20

ment's attempt to extend Leon beyond the context of defective search warrants. Scales, 903 F.2d at 768-69; United States v. Vasey, 834 F.2d 782, 789-90 (9th Cir. 1987). In Scales, the Tenth Circuit confronted a similar misapplication of Leon by a district court:

> The specific holding of Leon does not apply to the facts of this case, nor is the rationale behind it present here. When the DEA agents seized the suitcase and held it for more than twenty-four hours before obtaining a search warrant, they were not acting pursuant to a warrant subsequently deemed invalid. The "illegality" which arguably existed here was not a function of the agents' good faith reliance on a presumptively valid warrant. Moreover, the search of the suitcase after the search warrant was issued does not prevent us from evaluating the agents' behavior prior to that time.

903 F.2d at 768. As in Scales, the prolonged detention of Carter's Skyway bag was not based on the issuance of a warrant. In fact, it was not until after the dogs had alerted to the Skyway that FAA authorities attempted to obtain a warrant. The errors made by FAA authorities cannot be blamed on a defective warrant, and Leon is reserved for cases in which search warrants are later determined to have been invalid. See, e.g., United States v. White, 890 F.2d 1413 (8th Cir. 1989).

IV.

An individual's Fourth Amendment right to be free from unreasonable seizures cannot be eviscerated by the fact that the detention of his property began as a legitimate seizure incident to a lawful arrest. There is nothing reasonable about the nineteen-and-one-half hour delay from the time Carter requested the return of his property until FAA authorities finally conducted a sniff test of his luggage. The government, in effect, has asked that we overlook Place, so that it can be given a greater length of time to investigate other possible crimes wholly unconnected to the one for which Carter was arrested. Sanctioning such a theory would denigrate the meaning of the Fourth Amendment. Unwilling to subvert further an amendment once regarded as a bedrock of our civil liberties, I would hold that the cocaine found in Carter's luggage was the fruit of an unconstitutional

21

seizure. As such, I believe that the district court committed reversible error by denying Carter's motion to suppress and that the plea agreement Carter entered is invalid.

For these reasons, I respectfully dissent from the majority opinion affirming the judgment of the district court.

I am authorized to state that Judge Hall, Judge Murnaghan and Judge Michael join in this dissent.

22